## UNITED STATES et al. v. PENNSYLVANIA SALT MFG. CO.

(District Court, E. D. Pennsylvania. December 15, 1926.)

No. 2725.

1. **Navigable waters ⊙⊸36(2)—State law controls rights of riparian owner in tidal lands above low-water mark.**

Rights of riparian owner on navigable tide waters to lands above low-water mark are determined by the law of the state.

2. **Navigable waters ⊙⊸36(2)—Riparian owner's utmost limit of title to Pennsylvania tidal lands is to low-water mark.**

Under the Pennsylvania law, the utmost limit of title in a riparian owner in lands on tidal waters is to low-water mark.

3. **Navigable waters ⊙⊸36(1)—State of Pennsylvania has title to lands under navigable waters below low-water mark.**

Title to lands under its navigable waters below low-water mark is in state of Pennsylvania.

4. **Navigable waters ⊙⊸36(3)—Rights of abutting owner below high-water mark are subject to police power of state and federal control of navigation.**

Lands of abutting property owner below high-water mark are subject to exercise of police power of state, and to control of United States as guardian of rights of navigation.

5. **Navigable waters ⊙⊸16—Right of navigation is not right to have navigable waters to navigate.**

Though the right of navigation extends wherever there is navigable water to navigate, it is not a right to have navigable waters to navigate.

6. **Navigable waters ⊙⊸36(3)—Sole right of one other than landowner to lands between high and low water mark in Pennsylvania is right of navigation.**

The sole right that any one other than landowner has in land below high-water mark and above low-water mark, under the Pennsylvania law, is the right of navigation.

7. **Navigable waters ⊙⊸36(3)—Under Pennsylvania law, right of persons not owner to navigate over land between high and low water mark may be curtailed by state.**

Under the law of Pennsylvania, the sole rights of persons, except landowner, to navigate over land between high and low water mark, may be curtailed or taken away by the state.

8. **Navigable waters ⊙⊸36(4)—Landowner, with state's permission, may obstruct navigation over lands.**

Landowner cannot of right obstruct navigation over his lands, though with permission of state he may build a structure which is an obstruction.

9. **Navigable waters ⊙⊸39(2)—Rights exercised by riparian owner within boundaries of land only are rights of landowner.**

Rights of riparian owner, exercised within the lines of his land, are those of a landowner, but if exercised outside of boundaries are only such as are otherwise acquired.

10. **Navigable waters ⊙⊸36(4)—State's consent to riparian owner's obstruction of navigation below low-water mark includes right to build on and use state's lands.**

Consent of United States to riparian owner's obstruction of navigable waters means only that it will not interfere; where as consent of state means more, namely, that, so far as obstruction is below low-water mark, riparian owner may build on the lands of the state and so far use them.

11. **Navigable waters ⊙⊸36(4)—Riparian owner's construction in navigable waters is not land below low-water mark.**

Riparian owner's construction in navigable waters is property, but is not land, except above low-water mark.

12. **Navigable waters ⊙⊸36(4)—Riparian owner, constructing slip overlapping land of defendant, adjoining owner consenting held not entitled to exclusive right to charge wharfage for use of defendant's pier, when use of slip was included.**

Where plaintiff, a riparian owner, whose land adjoined defendant's, with consent of defendant constructed a slip between them, which extended 13 feet over defendant's land, and as part of such agreement constructed a concrete

retaining wall alongside of defendant's pier, with right to defendant to use such bulkhead for all lawful purposes *held*, plaintiff was not entitled to exclusive use of slip, or to exclusive right to charge wharfage for use of defendant's pier, when use of slip was included.

13. Navigable waters ⊙—36(4)—Right of navigation in waters over land is public easement.

Right of navigation in waters over lands in private ownership may be considered a public easement.

In Equity. Suit for injunction by the United States and the Merchants' Warehouse Company against the Pennsylvania Salt Manufacturing Company. On trial hearing or pleadings and proofs. Decree for defendant.

George W. Coles, U. S. Atty., and Joseph L. Kun, both of Philadelphia, Pa., and Ralph H. Hallett, of Washington, D. C., for the United States.

M. Hampton Todd, of Philadelphia, Pa., for plaintiff Merchants' Warehouse Co.

John F. Lewis, William Findlay Brown, and Charles B. Downs, all of Philadelphia, Pa., for defendants.

David J. Smyth, of Philadelphia, Pa., for the state of Pennsylvania.

DICKINSON, District Judge. There being the divergence of views between counsel and ourselves, later referred to, we have thought it well to file now this expression of our own, granting to counsel leave to file requests for the findings of fact, which will base the conclusions of law which they may further request to be found. This will enable them to get the cause, as they view it, upon the record. Because of this difference with counsel, we have made the statement of our views of greater length than we would otherwise deem necessary.

### The Pre-Lis Fact Situation.

We have incorporated in this statement no facts which are in controversy. For economy in verbiage, we first define words and phrases of which we will make use. There are two plaintiffs, one of which is the landowner; the other, its lessee. By plaintiff we mean the landowner plaintiff. The conventional compass points in use call up the river north and the Jersey shore side east. The lands of the plaintiff are on the south of the defendant's lands. If the north and south boundary lines of these respective properties are imagined to be indefinitely extended or projected eastwardly into the river bed, what we will call the north and south land or property lines of each property can easily be vizualized. We have made the eastern or river side boundary line the subject of a specific fact finding later.

There has been some indulgence in a preliminary sparring exhibition over facts which are not really in controversy, but the pre-lis fact situation is that here stated.

The plaintiff and defendant own adjoining lands fronting on the Delaware river. The defendant, in 1844, was granted and exercised the privilege to erect a pierhead construction, extending from its lands out in the river below low-water mark. The plaintiff, having no permit to make a pier and slip construction outside of the projected side lines of its riparian lands, but wishing to have such a construction, with a slip on its north side of a greater width than that of its own land holdings, acquired from defendant the right to go about 13 feet over the projected south line of defendant's lands, and to that extent into the pier construction of the defendant. This necessitated some kind of a bulkhead or retaining wall along the new south line of the defendant's narrowed pier. Such a protection was erected in the form of a concrete wall, under an agreement between the parties by which the defendant granted to the plaintiff the privilege of entering upon its wharf property for the purpose of making the construction, all of which was north of the 13-foot strip.

The defendant "reserved" the right to the use "for all lawful purposes" of this bulkhead. The physical result was a slip of about 144 feet in width immediately south of and adjoining the defendant's reconstructed pier. Thereafter the defendant used its whole pier, including the concrete wall, for the purpose of docking its own boats and other vessels (the latter paying wharfage charges), and of taking on and discharging cargoes. This was continued for two years or more, without any objection or complaint on the part of the plaintiff. At a later date the plaintiff leased its property to its coplaintiff (a private corporation), and soon thereafter set up a claim to the rights which we will next define.

### The Pleadings.

The original bill was filed against George F. Sproule, director of wharves and docks, together with the city of Philadelphia and the present defendant. An amended bill was afterwards filed against the present defendant alone. The rights claimed can be best defined in terms of the prayers of the bill, which are:

(1) For an injunction against defendant from permitting any vessel to enter or use the slip.

(2) For an injunction against collecting or making any charge for wharfage.

(3) For an accounting for all wharfage and other fees heretofore collected from vessels using slip, and for an award to plaintiff for wharfage thus collected and compensation for the wharfage privileges enjoyed by the defendant's own vessels.

The proposition on which the right to the grant of these prayers is based, as we understand it, is that the plaintiff, by reason of its riparian ownership and its construction of the slip, is the owner of all the land under the water between its projected property lines, plus the strip 13 feet wide which it had acquired from the defendant, and hence became the exclusive owner of the slip and the waters therein, and acquired the exclusive right to its use and to the wharf.

If this proposition be accepted, it is sufficiently clear that no vessel could make use of the wharfing facilities afforded by the pier of the defendant on its south side or its end, without trespassing upon the waters covering the lands to which the plaintiff thus makes claim; but it is not clear how even this would found the full claim of right asserted by the bill. Conceding the plaintiff's utmost claim of right, there might still be some question of its right to the equitable remedy invoked; but as a denial of this would result simply in an order to transfer under equity rule 22, and as we assume the parties wish to submit to a decision of their rights, we proceed to the determination of them. The bill may, moreover, be maintained as one to restrain repeated trespasses or a continuing one.

#### Fact Discussion.

We may anticipate here the conclusion reached, which is that the plaintiff has no such title, nor any such right as is made the basis of this bill. We are somewhat embarrassed in the statement of this conclusion, and of the propositions of law upon which we base it, for the reason that we find ourselves out of accord with the senior counsel for the defense upon the propositions upon which we base the conclusion reached, which he is unwilling to accept, although he does, of course, accept the conclusion. This difference in opinion of what is the law may be expressed in the significance to be attached to what is called the low-water mark doctrine of the law of Pennsylvania. As we view it, this cause cannot satisfactorily be determined without a fact finding of whether the locus of the dispute is above or below low-water mark. In the opinion of counsel this has no value.

We have the highest respect for the legal judgment of this senior counsel, emphasized in all matters maritime, in which he is an accepted expert; but none the less we must perforce follow our own judgment, with, of course, an expression of due deference to the contrary opinion.

We place an equally high value upon the legal judgment of counsel for the plaintiff, although the one who has the active charge of the case is not by training of the admiralty bar, and he, as we understand it, concurs in the view in this respect of the senior counsel for the defense.

It will be observed that in this fact statement we expressly avoided all reference to the eastern or river side boundary line of the lands of the parties, withholding this for a specific fact finding. This is the fact now discussed.

Any one who has had his attention called to the tidal conditions of the Delaware in respect to riparian land ownership is familiar with certain lines. They are the high and low water mark lines and the port warden or pierhead line. We ignore the high-water mark line as not (except for reference) being concerned in this discussion. There are seven different lines, each known by the name of low-water lines. The differentiation of these is of little practical importance here, beyond making clear exactly what the meaning of the phrase "low-water line" is, as, and when used.

1. There is the line described by the lateral limit of the water at low tide, or, as it is called, dead low water. This line is a practically indeterminable one, because it varies at every low water, as influenced by the condition of the bottom, the winds, the season of the year, and the state of the moon, which, according to the accepted theory of tides, "regulates" them. This line is the actual line of the water at the end of its ebb, and is the natural low-water line.

2. There is the low-water mark line indicated by physical traces on the bottom, made by successive tides, those most frequently recurring leaving "marks" which are observable in places. This line is a meandering line, because it is indented and deflected by every pebble on the beach.

3. There is the mean low-water mark line (such as surveyors run), which is the closest practical approximation to the line indicated by the physical marks left by the tide water. This line is really a conventional line, representing the average low-water line, made into a regular continuous line, although curving toward and away from the fast land, as the deeper water approaches or recedes from the shore line. In other words, it is the mean

low-water mark line, established as nearly as it practically may be, in order to get a line which a surveyor can locate and follow. Because of this it is sometimes called the survey or surveyor's low-water line.

4. There is what may be called the artificial low-water line. It is physically possible to erect an obstruction to the lateral flow of tide water. This is often done. When done, the line of obstruction is the water line. If below what would otherwise be the high-water line, it becomes a new high-water line; and if there is water up to the obstruction at dead low water, it also is the low-water line.

5. There is another type of artificial low-water line. It is physically possible (and often done) to excavate the land above the low-water line to and even above the high-water line, so that there is deep water, at low-water slack, above the natural low-water or even high-water line. This new line then becomes an artificial low-water line, as well as high-water line.

6. There is yet another mean low-water line, which may be called the official line. The state of Pennsylvania has time out of mind exercised jurisdiction over riparian lands fronting on the Delaware river (so far at least as navigable) to fix the low-water line. This it did through its board of port wardens after this board was constituted. The line thus officially fixed was always known as the "port wardens mean low-water mark line." It was run very much as the conventional or surveyor's line above mentioned was run. It in a general way paralleled the natural channel of the river, and was a line so indicated as that a surveyor could locate and follow it.

7. We are not yet done with these artificial low-water lines for there is still another. This is known as the bulkhead line. It is a line up to which the riparian owner may build land constructions without further permission from the state or United States authorities, they both having consented thereto. It is really a conventional low-water line, being in practical and accepted effect the established low-water mark line fixed with the real or assumed consent of the landowner.

We have discussed the fact features of this low-water mark line with great and doubtless painful fullness, because of the other fact referred to, that counsel deem it to be of no importance; but we deem it to be, at least in one view of the case, of controlling importance. It has no place in a fact discussion, but for clarity of statement, and to show the legal bearing of the fact to be found, we anticipate here a proposition of law hereafter advanced (in which counsel, at least for de-

fendant, are in accord with us), that the utmost limit of the title of a riparian owner under the law of Pennsylvania to his lands on the tide-water side is the low-water mark line, and that the title to the land under tide water below this line is in the commonwealth. The low-water mark line thus becomes the eastern land or title property line of both plaintiff and defendant. This, it seems to us, makes it important to find as a fact whether this controversy concerns a place above or below this line, in order that we may know whether the conflicting claims of right set up by these respective landowners are founded upon a land property title right or something else.

8. There is still another line, with which we are directly not concerned, but which neverthless enters into the general discussion and, for this reason, is here defined. This line is known as the "port warden" or "pierhead line." It marks the utmost outer limit of the lawful encroachment of land constructions upon the navigable channel of the river. Formerly this was established by state officials, but is now fixed by the United States engineers, who have in charge the duty of protecting water borne commerce from obstruction.

One consequence of the circumstance, already several times mentioned, that counsel attach no importance to this low-water mark line, is that the evidence from which it is to be found was not brought out at the trial, but must be looked for in the record. It is there, however, and there is no doubt of the fact that the officially established bulkhead line is the low-water mark line, which is the eastern or river side title or property line of the lands of the parties.

We are indebted to counsel for the state of Pennsylvania, who was let out of the case by the amendment to the bill, but who as amicus curiæ brought out clear evidence of this fact.

### Fact Finding.

The finding is made that the low-water mark line, which is the eastern boundary or title property line of the lands of both plaintiff and defendant, is the official bulkhead line above mentioned, and that the locality of this dispute is partly above and partly below this line, and what is the same finding differently stated, the contention here is over rights in a locus which is partly above and partly below this low-water mark line, and thus partly within and partly outside of and beyond the property lines of the abutting landowners.

### Discussion of the Law of the Case.

[1] This settles the fact so far as concerns this court. What, then, is the law arising out

of this fact situation? For the land title part of the law we look to the courts of Pennsylvania and accept the law as they have found it to be.

It may contribute to clarity to have in mind that there are several rights to be appraised. These are first the rights of the plaintiff and those of the defendant, and the rights of each which may possibly arise (a) out of their land property rights; (b) out of their right to a construction erected by them although upon the land of the state; or (c) out of the right of navigation.

The plaintiff has cited to us (among others) the case of Braisted v. Denton (D. C.) 115 F. 428. This case cannot be of the aid to us it otherwise would be, because it is ruled upon the proposition that under the law of New York the land beneath the waters of the slip there in dispute was the landed property of the claimant. Here the plaintiff, as will appear, has no such title under the law of Pennsylvania to the greater part of the area in dispute as we have found the title lines to be.

[2, 3] The defendant has referred us (among others) to the following Pennsylvania cases: Wainwright v. McCullough, 63 Pa. 66; Commonwealth v. Association, 169 Pa. 24, 32 A. 121; Black v. American, 264 Pa. 260, 107 A. 737. These cases are of assistance so far as they give authoritative confirmation to the well-settled law of Pennsylvania that (1) the utmost limit of title in a riparian owner of lands on tidal waters is low-water mark; and (2) the title to the lands below the low-water mark line is in the commonwealth. Here the fact that the rights of both parties qua landowners are involved becomes of importance. It is true that, if the plaintiff could not make good the rights here set up over lands to which it holds title, a fortiori it could not over lands to which it has no title. The other side of this proposition, however, could not be accepted, that, because the defendant possessed the rights which it asserts over lands to which it has title, it had the same rights over lands to which it does not have title.

[4] We may profitably here eliminate one feature of possible discussion. The lands of an abutting property owner below high-water mark are subject to the exercise of the police power of the state as the protector of highways and to the control of the United States as the guardian of the rights of navigation over navigable waters.

[5] The right of navigation extends wherever there is navigable water to navigate, but it is not a right to have navigable waters to navigate. The right is controlled and limited by the inexorable fact of navigable water or its absence. It is talking nonsense to talk of a right of navigation over dry land. The powers of the United States are discussed in the case of U. S. v. Banister (C. C.) 155 F. 583; but, as no law of the United States is here invoked, we may dismiss this feature from consideration, and confine our attention to the law of the state. Here again it becomes important to distinguish between the power of control which the state has over the lands of a landowner and over its own lands. The former power (there being no power of eminent domain here in question) is the police power. [6-8] The exercise of this power over lands below high-water mark is closely analogous to that over lands within the limits of a land highway. Navigable streams are often spoken of as highways. The sole right any one (other than the landowner) has in the lands below high-water mark and above low water is the right of navigation. The state may curtail this right, or take it away in toto. The landowner cannot of right obstruct navigation over his lands any more than he can of his own right encroach upon a highway on his lands. The state, however, may give him permission to build a construction which is an obstruction. What, then, are his rights?

[9] Our view is that, if his rights are exercisable within the lines of his lands, the rights are those of a landowner; but, if they are exercisable outside the boundaries of his own lands, then his rights are not those of a landowner, but only such as are otherwise acquired.

[10] Applied to the facts of this case, these propositions mean that, with the permission of the state and of the United States, these parties had each built constructions in navigable waters which, because of this consent, were lawful constructions, notwithstanding navigation was thereby, to some extent, impeded. The consent of the United States simply meant that it, as guardian of navigable waters, would not interfere. The consent of the state meant that, and more. So far as the construction was above low-water mark, it meant simply what the consent of the United States meant; but, so far as it was below low-water mark, it meant also that the riparian owner might build upon the lands of the state, and so far use them.

[11] What further follows is that the construction, so far as above low-water mark, belongs to the landowner qua landowner. So far as on land below low water, the construction belongs to him, because he constructed it as a licensee of the state. The construction is his property, but it is not his landed prop-

erty. Above that line it is land; below that line it is not land. The construction is his property, although bedded in the lands of the commonwealth, because the state has consented to its construction. It is true that it is the policy (confirmed by state statutes), both of the state and the United States, for obvious reasons, not to license constructions on the river front of lands by others than abutting property owners; but this circumstance does not affect the legal rights of the licensee to constructions beyond his property lines.

[12] The plaintiff, as we have said, claims the exclusive right to this slip and its waters, and the exclusive right to charge wharfage for the use of defendant's pier (if the use of the slip is included). The basis of this claim we assume is plaintiff's claim to the ownership of the land under the waters of the slip, and hence of the slip, and because of its construction of the slip, plus the license of the state and the United States so to do, and plus, also, the rights acquired from defendant to the 13-foot strip.

We have already, by anticipation, stated our refusal to affirm the broad claim made to defendant's pier, or to the exclusive right to the waters which lap it, or to their navigation. Plaintiff's claim, so far as based on land ownership, is as hereinafter stated, but is ill-founded outside of its property lines, because it has no such ownership. No claim can be founded on the ownership of the pier, because this belongs to the defendant. It is true the plaintiff constructed the bulkhead, but this was under a contract which gave it no shadow of claim to the pier. The rights now set up are the very rights for which the parties sought to deal with each other, but the dealings fell through and came to naught. The full right claimed by plaintiff cannot flow from the right of navigation, because that is a right held in common with all navigators. It has no necessary relation with land, land titles, or land ownership; nor is it exercisable within land, but is a wholly separate and distinct right.

We do not see that the plaintiff has any right of navigation with which there has been interference by the defendant. It could scarcely be claimed that the pier construction was an interference with its right of navigation, because this was constructed under the permission of the state, and the plaintiff itself built the wall or sustaining bulkhead. We do not mean that plaintiff has made any such claim, but merely to emphasize the point that, if it had first constructed its slip, and the defendant had thereafter constructed its pierhead, which did interfere with plaintiff's use of its slip, we do not see that even then it could complain of any legal injury, much less ask the defendant to be enjoined.

We have been referred to the case of Tinicum Fishing Co. v. Carter, 61 Pa. 21, 100 Am. Dec. 597. We happen to be very conversant with that case, because it arose in Delaware county, and was there made use of as a text-book for the instruction of law students on the subject of riparian rights in tide-water lands. The case is famous for having been longer in litigation, in the various forms it took, than any other Pennsylvania case. Its final funeral obsequies were professionally attended by the writer. It was held in that case, in an opinion by Chief Justice Sharswood, that no easement right in a navigable stream, even if claimed by prescription or by grant, could prevail against the power of the state (with, of course, a permit from the United States) to license the construction of a pier. The easement claimed there was one of fishery, or the right to draw a seine over the bottom of the river; but the decision would broadly cover all claims of right.

The case stands for the well-settled doctrine of the law of Pennsylvania, already several times stated, (a) that a riparian landowner has no property rights qua landowner beyond low-water mark; (b) that the title to the land below low-water mark is in the commonwealth; (c) that the title to the land of the riparian owner between high-water mark and low-water mark is subject to the control of the police power of the state; (d) that the control below low-water mark is in the state, both because of its police power control over navigable water highways and also its ownership of the land under the water; and (e) that whatever easement rights (private or public) exist or may be acquired in and over navigable waters and the lands under them are subject to the control of the police power of the state (we are ignoring the control of the United States), so far as the navigable water is over lands in private ownership, and to the added control of the state as a landowner below low-water mark, and hence that all such public rights and easements may be to a degree or in toto taken away by the state or its lawful licensee.

[13] These principles and doctrines of the law, when applied to the fact situation here existing, are decisive of this controversy, so far as the rights of the plaintiff are thus defined. Counsel for the United States, with characteristic lucidity and definiteness of statement, has laid down certain fact and legal propositions worthy of comment, and to some of these we shall as briefly as possible

advert. The analogue of property abutting on a land highway, with the land title extending over the highway lines, and of land between high and low water mark on a navigable highway, is helpful, and the propositions may well be considered with this analogy in mind. Rights of navigation in waters over lands in private ownership and land highway rights may be considered public easements.

1. A riparian landowner has the right of unobstructed access to the navigable waters which lap his shore, but as soon as he passes the line of his property his right of navigation is a right which he holds in common with others. The analogue, however, we think holds good. An abutting landowner has the like right of access to the highway, but when he gets upon it beyond his property line his right of locomotion is likewise held in comment with other users of the highway. Both have similar dual rights, so far as the highway water or road is over the lands of the landowner. The owners own their lands subject to the respective public easements. These, however, they may be permitted to obstruct. A riparian landowner may, with the permission of the state and of the United States, erect a construction upon his own lands, which is pro tanto an obstruction to navigation; an abutting property owner may, with the permission of the state, erect an areaway, steps, or other construction which is an obstruction pro tanto to travelers upon the highway. Each is doing the same thing. He is exercising a right of property in his lands in ownership principle precisely the same as when he builds above high-water mark or outside of the street lines. The only difference is that between a right and the exercise of it. He may exercise all his rights of ownership (sub modo) without the permission of the state outside of the limits of the highway, but within those limits he can exercise none, except only as he has such permission.

2. A riparian owner may excavate his lands above high-water mark, and thus allow ingress to the water far within the limits of his land ownership. An abutting property owner may do the like by constructing a private way from the highway into or across his lands. Here, however, the analogue in one respect fails. A land highway has definite limits, which are fixed and invariable. A navigable highway contracts and expands with the water which makes it.

3. The analogy again holds good when other features of the rights which flow from land ownership and those which spring out of public easements are under consideration. As land ownership rights are qualified by a public easement right, so these public easement rights are themselves limited. For illustration, the courts of Pennsylvania have held (whatever, if the question were a new one, they would now hold) that the public easement of a highway did not include the right to construct a trolley railway. In consequence, they could not be constructed without the consent of the owner of the title to the land on which built. This necessitated the grant of the power of eminent domain to street railway companies. The right of navigation is likewise a limited right. It would not include, for illustration, the right to use a pier construction, nor the right to use land to take on or discharge cargo, nor would it include the right to use land in private ownership for anchorage purposes, beyond the right to anchor when included in a navigating use, as for protection against perils of the sea or dangers of navigation.

The rights of the defendant are not directly in issue, but they do bear directly upon the injunctions asked to issue:

1. The defendant has all the rights of a landowner above the high-water mark line.

2. It has the like rights down to the bulkhead line, which we have found to be the eastern boundary line of its landed property; the state and the United States having withdrawn their police control of the riparian lands above this line.

3. It has the rights of a landowner in the bulkhead construction in controversy, so far as built upon its land, subject to the right of the plaintiff to have this bulkhead maintained as a protection to the north side of its slip as a holding wall or support.

4. It has the rights of an owner (although not as a landowner) in all constructions which with the consent of the state it has constructed, so far as the same extends beyond or outside of the bulkhead line.

5. It has no other rights in or to the slip than the rights of navigation, which it holds in common with the navigating public.

For the purposes of a like summary, the rights of the plaintiff may be stated in reverse order:

1. It has the like right, as above stated, to its constructions, so far as the same are outside of or beyond the bulkhead line.

2. It has no rights in the waters of the slip, or in the bottom land outside of and beyond the bulkhead line, other than its navigating right held in common with others, plus the right (really included in practical effect in its above right) of access to its riparian lands, being the right of ingress, egress, and regress thereto and therefrom.

3. It has the right of land ownership in that part of the slip above low-water mark to high-water mark, subject to the public easement right of navigation.

4. It has all the rights of a landowner to that part of the slip which is above high-water mark (subject to the public easement right of navigation over its waters as part of the navigable waters of the Delaware), including the right to exclude such waters from entrance above high-water mark and (as it has the consent of the state) above the bulkhead line.

We may apply here a test to the claim of right made by the plaintiff, dividing its claim (as the bill does not do) between the localities below and above low-water line:

First, as to the part of the slip below the bulkhead line:

1. No claim of right can be based on land ownership of the land beneath the waters of the slip, because plaintiff has no such ownership.

2. No such claim as made can be based on the ownership of riparian lands, because this is limited to a mere right of access, or the right of egress, ingress, and regress.

3. No such claim can be based on the ownership of a pier or other land construction, because that here in dispute belongs to the defendant.

4. No claim can be based on construction of the slip, because this would not confer either ownership of navigable waters or of the land beneath them.

5. No such claim can be based upon the navigable rights of the plaintiff, because this is a right in common, in which the defendant equally shares.

Second, as to the part of the slip above the bulkhead line:

1. The claim of the plaintiff is here based upon land ownership, and is sub modo a good claim.

2. The land property rights of the plaintiff are, however, here subject to the public easement right of navigation through and over navigable waters.

We are unable to see that the agreement between the parties affects the rights of the parties with which we are concerned. The agreement is closely akin to those which are not uncommon between adjoining landowners respecting party walls. The plaintiff built the wall with the consent of the defendant, partly on lands of the defendant and wholly within its projected side property lines. The wall answered to the common purpose of retaining the side of defendant's pier construction and upholding the same side of what we have been calling the plaintiff's slip, and each has a property right in it to this extent. The agreement upon a right in the defendant to use the wall for all "lawful purposes" means no more than that the defendant had surrendered nothing of what would otherwise have been its rights, had the wall not been built by the plaintiff.

No decree can be made, nor can the question of costs be determined, until the bulkhead line is fixed with reference to the locality of the dispute. In accordance with the practice, no decree is now made, but the parties have leave to submit formal requests for findings of fact and conclusions of law, and to submit the draft of a decree in accordance with this opinion and the answers to such requests. No definite decree can be entered until the exact location of the slip is defined. The parties can doubtless agree upon this, but, if they do not, the facts will be found by the court.

Jurisdiction of the cause is retained for this purpose, to answer the requests, to dispose of the question of costs, and to do whatever is needful to the entry of a final decree.