THE OIL CITY SAND AND GRAVEL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65159. Filed April 10, 1959.

*James M. Houston, Esq.,* and *Donald L. Ewart, Esq.,* for the petitioner.

*David L. Ketter, Esq.,* for the respondent.

WITHEY, *Judge:* The respondent has determined deficiencies in the income and excess profits taxes of the petitioner of $12,501.01 and $9,974.40 for 1952 and 1953, respectively. The single issue is whether the respondent erred in disallowing deductions taken by petitioner for the taxable years 1951 (in computing an unused excess profits credit carryover to 1952), and 1952 and 1953 for percentage depletion of sand and gravel.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

The petitioner is a Pennsylvania corporation organized in 1925, and has its principal office in Oil City, Pennsylvania. It filed its corporation income tax return for 1951 with the collector of internal revenue in Pittsburgh, Pennsylvania. It filed its corporation income and excess profits tax returns for 1952 and its corporation income tax return for 1953 with the district director of internal revenue in Pittsburgh, Pennsylvania.

Except for small amounts of mason's sand which it purchases and handles as an accommodation to its customers, the petitioner is engaged solely in the business of, and its possibility of profit therefrom depends solely on, dredging sand and gravel from the bed of the Allegheny River at two locations, namely, Oil City, Pennsylvania, and Franklin, Pennsylvania, processing the same to obtain commercially marketable products and selling such products. Oil City is approximately 133 miles and Franklin is approximately 129 miles above the mouth of the Allegheny River at Pittsburgh, Pennsylvania. "Slackwater navigation" on the Allegheny River ends at or near East Brady, Pennsylvania, which is about 72 miles above the mouth of the river at Pittsburgh. Above East Brady the river, while navigable in law for the purposes of Federal and State regulations, is shallow and not commercially navigable because of its rapid fall and the lack of locks and dams.

The petitioner has operated at Oil City continuously since 1929. At that location the petitioner has a dredgeboat, barges, towboat, and a processing and treatment plant in which it has invested approximately $188,000. The plant and shore installations at Oil City are erected on a tract of land owned by the petitioner consisting of 5.8 acres having a frontage on the left bank of the river looking upstream of approximately 2,800 feet. The cost of the land to the petitioner was approximately $19,000.

In 1947 in order to meet increased demand for sand and gravel and at the same time prevent competition in the area, the petitioner began a second dredging operation at Franklin. At its Franklin location the petitioner has a dredgeboat, barges, towboat, dragline, and processing and treatment plant in which the petitioner has invested approximately $125,000. The plant and shore installations at Franklin are erected on a tract of land owned by the petitioner consisting of 19.2 acres and a frontage on the right bank of the river of 1,625 feet. The cost of the land to the petitioner was approximately $11,000.

At all times since 1929 the petitioner has conducted its dredging operations under permits issued by the Corps of Engineers of the United States Army and by the Department of Forests and Waters of the Commonwealth of Pennsylvania. The petitioner has not paid and does not pay any fee or royalty to the United States with respect to the permits issued by the Corps of Engineers. Petitioner paid an initial fee of $20 to the Commonwealth of Pennsylvania with respect to the permit issued by the Department of Forests and Waters but has not paid and does not pay any other fee or any royalty to the State.

During the time since the petitioner began operations at Oil City

in 1929, no one else has engaged in dredging operations in the Oil City-Franklin area.

At both petitioner's Oil City location and its Franklin location, the dredges dig the material (sand and gravel) out of the riverbed and deposit it in barges which are moved by towboat to petitioner's plantsites on the shore. At Franklin the material is dumped near the shore and transported to the plant by a dragline hoist. At Oil City, a clamshell bucket lifts the material from the barges and deposits it in the plant.

At each of the petitioner's plants the material, which as dredged from the river is not commercially marketable, is crushed, washed, and separated into sand and gravel of the quality and sizes commonly specified as aggregates for concrete, used in building and road construction. The sand and gravel resulting from the foregoing treatment process constitute the first commercially marketable products from the petitioner's operations.

The material (sand and gravel) composing the riverbed deposits which the petitioner has dredged and continues to dredge was deposited by glacial action. Once such deposits are removed or exhausted they are not replaced to any extent by action of the river. The river merely deposits mud in the places from which such deposits were removed and there is no market for mud.

Because of the shallowness of the river and sharp fall of its bed in the Franklin-Oil City area, petitioner can dredge sand and gravel from the river only within a relatively small area adjacent to each of its processing and treatment plants.

If the petitioner dredges more than approximately 1½ miles upstream from either riparian property, the water in the stream becomes too shallow for operating the dredge. If petitioner dredges more than approximately the same distance downstream from either riparian property, the water at such property is lowered to such an extent that the towboat, which transports the dredged material from the dredge to the processing and treatment plant, cannot navigate to reach the plant.

The only economical method of dredging and processing sand and gravel in the Oil City-Franklin area of the river requires the use or ownership of riparian property on which marine equipment may be protected and harbored during the winter and on which can be located a processing and treatment plant and stockpiles of processed materials awaiting sale.

Except for the two riparian properties owned by the petitioner, there is no site on either bank of the Allegheny River between the upper limits of petitioner's potential dredging operations at Oil City and a point 3 miles below the location of petitioner's Franklin plant which is by nature physically adapted to the protection of marine

equipment during the winter, to the location of a processing and treatment plant, and to providing adequate space for stockpiles of processed materials.

It would not be economically feasible for a competing dredger to attempt to adapt riparian properties by nature unsuited for use in connection with dredging operations so as to enable him to dredge the areas which are covered by petitioner's operation in competition with the petitioner.

Because of ice in the river at other times of the year, the petitioner is able to conduct dredging operations at its two locations only during the months of April through November. During those months the petitioner dredges, processes, and stockpiles sufficient sand and gravel to satisfy market demands for the entire year. The demand for sand and gravel in the Oil City-Franklin area is less than the productive capacity of petitioner's dredging and processing operations during the months of April through November. Consequently, because of the limited demand, the petitioner does not operate its dredges and plants at their full capacity during those months.

The demand for sand and gravel would not be appreciably increased by reducing its selling price. This is so because the cost of sand and gravel is a relatively small portion of the finished cost of the principal products such as roads in the construction of which sand and gravel are used.

The petitioner has no competition in the sale of sand and gravel in the area coming within a radius of approximately 10 miles from either of its locations. The cost of transporting sand and gravel in the Oil City-Franklin area in relation to their selling prices is such that it would not be economically possible to expand sales by extending the territory in which sales are made.

No other person could remove the sand and gravel in the riverbed in the area between Oil City and Franklin by the usual economical methods without using petitioner's lands for the purpose of entering the river, for protecting and harboring his marine equipment during the winter, and for a processing and treatment plant and a storage area for processed sand and gravel.

The petitioner's ownership of two parcels of riparian land at Oil City and at Franklin gives it exclusive physical and economic control of the dredging of sand and gravel located in the riverbed within an area of approximately 1½ miles upstream and 1½ miles downstream from each parcel of land from which areas the petitioner dredged sand and gravel during the taxable years 1951, 1952, and 1953.

In its income tax returns for 1951, 1952, and 1953, the petitioner took deductions of $5,514.48, $15,870.18, and $15,047.89, respectively, for percentage depletion of sand and gravel. The foregoing deductions were not in excess of 5 per cent of petitioner's gross income from

mining sand and gravel for the respective years and were not in excess of 50 per cent of petitioner's net income (computed without allowance for depletion) from the property for the respective years. In determining the deficiencies here involved the respondent determined that the petitioner did not have any economic interest in the sand and gravel removed from the bed of the Allegheny River during the respective years and disallowed the deductions in question.

OPINION.

Taking the position that the sand and gravel deposits dredged by it during the taxable years in question are exhausted by dredging, the petitioner contends that under the holding in *Commissioner* v. *Southwest Exploration Co.*, 350 U.S. 308, and on the basis of the factual situation presented, it had the requisite economic interest in the deposits to entitle it to the deductions taken for the respective taxable years here involved for percentage depletion. The respondent takes the position that the petitioner has failed to establish that it had an economic interest in the sand and gravel in place within the holding in *Commissioner* v. *Southwest Exploration Co.*, *supra*.

Continuously since 1929 the petitioner has conducted operations at Oil City, Pennsylvania. During that time petitioner has engaged in dredging, processing, and selling sand and gravel from the bed of the Allegheny River, a navigable stream. In addition, the petitioner continuously since 1947 has engaged in dredging, removing, and selling sand and gravel from the bed of the Allegheny River at Franklin, Pennsylvania. Continuously since 1929 the petitioner has conducted its dredging operations under permits issued by the Corps of Engineers of the United States Army and by the Department of Forests and Waters of the Commonwealth of Pennsylvania.

The permits issued by the Corps of Engineers contained the following recital:

It is to be understood that this instrument does not give any property rights either in real estate or material, or any exclusive privileges; and that it does not authorize any injury to private property of invasion of private rights, or any infringement of Federal, State, or local laws or regulations, nor does it obviate the necessity of obtaining *State assent* to the work authorized. IT MERELY EXPRESSES THE ASSENT OF THE FEDERAL GOVERNMENT SO FAR AS CONCERNS THE PUBLIC RIGHTS OF NAVIGATION. * * *

The permits issued by the Department of Forests and Waters contained the following:

This permit does not give any property rights, either in real estate or material, nor any exclusive privileges, nor shall it be construed to grant or confer any right, title, easement, or interest, in, to, or over any land belonging to the Commonwealth of Pennsylvania; neither does it authorize any injury to private

**36**

property nor invasion of private rights, nor any infringement of Federal, State, or local laws or regulations; nor does it obviate the necessity of obtaining Federal assent when necessary;

Other provisions of the permits show that the permits were required and issued for regulatory purposes so as to permit free navigation and protect against any injury and damage to any works or structures along the portion or portions of the river covered by the permits.

Under the law of Pennsylvania, title to the beds of navigable rivers between their low watermarks and the contents of the beds are in the State. *Black* v. *American International Corporation*, 264 Pa. 260, 107 Atl. 737; *Post* v. *Wilkes-Barre Connecting R.R.*, 286 Pa. 273, 133 Atl. 377; *United States* v. *Pennsylvania Salt Mfg. Co.*, 16 F. 2d 476; *Mc-Crady-Rodgers Co.* v. *Colegrove*, 85 Pa. L. J. 304. However, the State has retained both the navigable waters of the State and the soil thereunder between the lines of the low watermark as eminent domain for the use of all its citizens. The right to dredge and remove sand and gravel from the beds of navigable rivers between their low watermarks is a public right which the people of the State have and have exercised and which the State has long recognized and encouraged. Sand and gravel removed in the exercise of such right becomes upon removal the private property of the person removing and appropriating them. *Solliday* v. *Johnson*, 38 Pa. 380; *Hunt* v. *Graham*, 15 Pa. Super. 42; *McCrady-Rodgers Co.* v. *Colegrove, supra*.

In *Commissioner* v. *Southwest Exploration Co., supra*, the State of California owned certain submerged oil lands off the coast of the State. The California State Lands Act of 1938 provided that oil might be extracted from such lands only from wells drilled on filled lands or slant drilled from upland drillsites to the submerged oil deposits. Other provisions of the Act required that derricks, machinery, and any and all other surface structures, equipment, and appliances be located only on filled lands or uplands. The Act also provided that the State commission might require each prospective bidder for such a State lease to furnish as a condition precedent to consideration of his bid, satisfactory evidence of "present ability to furnish all necessary sites and rights of way for all operations contemplated under the provisions of the proposed lease."

In 1938 the State of California published notice of its intention to receive bids for the lease of certain oil lands pursuant to the above-mentioned Act. Included in such lands was submerged land adjacent to uplands owned by Huntington Beach Company, Pacific Electric Railway Company, and Pacific Electric Land Company, sometimes hereinafter referred to as upland owners. Southwest Exploration Company became interested in submitting a bid for a lease of submerged land adjacent to the lands of the upland owners. Finding

that no filled lands were available, Southwest entered into three agreements with the upland owners whereby Southwest was granted the right of ingress to and egress from the designated uplands and the right to construct, use, and maintain all equipment necessary for drilling on the same lands. The upland owners reserved to themselves the right to give easements or subsurface well crossings in the uplands, except that they would not allow such easements for the purpose of drilling into offshore oil deposits while Southwest retained an interest granted to it by State easement. Southwest's rights were expressly subject to all rights previously granted by the upland owners. The agreements between Southwest and the upland owners defined "net profits" and provided that Southwest would pay a total of 24½ per cent[1] of its net profits from extraction and sale of oil to the upland owners. The agreements further provided that the upland owners did not thereby acquire a share in a lease or oil deposit and that it was not the intention of the parties to·create a partnership relationship.

As a result of the agreements between Southwest and the upland owners, the latter endorsed Southwest's bid for a lease submitted to the State of California. Southwest was the only bidder and was granted Easement No. 392 by the State in consideration of the "royalty to be paid, the covenants to be performed, and the conditions to be observed by the Grantee." One of those conditions was:

That each well drilled pursuant to the terms of this agreement shall be slant drilled from the uplands to and into the subsurface of the State lands. Derricks, machinery, and any and all other surface structures, equipment and appliances shall be located only upon the uplands and all surface operations shall be conducted therefrom.

The agreement between Southwest and the State of California further provided that, if Southwest should default in the performance or observance of any of the terms, covenants, and stipulations thereof, the State might reenter, cancel the agreement or close down wells not being operated according to the agreement.

The wells drilled by Southwest pursuant to the above-mentioned agreement between it and the State of California have produced oil continuously since 1939.

The question before the Supreme Court in *Commissioner* v. *Southwest Exploration Co.*, *supra*, was whether Southwest or the upland owners were entitled to deduct percentage depletion with respect to the portion of the Southwest's net income which it paid to the upland owners pursuant to its agreements with them. In holding that the

---

[1] Composed of the following:
17.75 per cent to Huntington Beach Company,
1.576 per cent to Pacific Electric Railway Company, and
5.174 per cent to Pacific Electric Land Company.

upland owners, and not Southwest, were entitled to deduct percentage depletion with respect to the portion of the net income paid to them, the Supreme Court restated the test for determining whether an interest is an economic interest in the mineral in place which was first set forth in *Palmer* v. *Bender*, 287 U.S. 551. The Supreme Court said:

In upholding the taxpayer's right to depletion on all such income, the Court based its decision on the grounds that a taxpayer is entitled to depletion where he has: (1) "acquired, by investment, any interest in the oil in place," and (2) secured by legal relationship "income derived from the extraction of the oil, to which he must look for a return of his capital." * * *

Respecting the contention of Southwest that there can be no economic interest separate from the right to enter and drill for oil on the land itself, the Supreme Court held that this factor did not preclude an economic interest in the upland owners since without their participation there could have been no bid, no lease, no wells, and no production. In concluding, in the circumstances of the case before it, that where a party essential to the drilling for and extraction of oil has made an indispensable contribution of the use of real property adjacent to the oil deposits in return for a share in the net income from the production of oil, that party has an economic interest which entitled him to depletion on the income thus received, the Supreme Court said:

Recognizing that the law of depletion requires an economic rather than a legal interest in the oil in place, we may proceed to the question of whether the upland owners had such an economic interest here. We find that they did. Proximity to the offshore oil deposits and effect of the state law combined to make the upland owners essential parties to any drilling operations. This controlling position greatly enhanced the value of their land when extraction of oil from the State's offshore fields became a possibility. The owners might have realized this value by selling their interest for a stated sum and no problem of depletion would have been presented. But instead they chose to contribute the use of their land in return for rental based on a share of net profits. This contribution was an investment in the oil in place sufficient to establish their economic interest. Their income was dependent entirely on production, and the value of their interest decreased with each barrel of oil produced. No more is required by any of the earlier cases.

Pointing to the fact that by reason of its ownership of the parcels of riparian land at the site of its Oil City and Franklin operations, it had exclusive physical and economic control over the deposits of sand and gravel for approximately 1½ miles above and below each site, the petitioner takes the position (1) that the use of its riparian land was as essential to its dredging operations as the use of the uplands was to the drilling operations in the *Southwest* case, (2) that because of its proximity to the sand and gravel the land at the site

of each of its operations had a special value which was depleted by its dredging operations, and (3) that by reason of the foregoing, it is equally as entitled to deduct percentage depletion as were the upland owners in the *Southwest* case.

Concededly the instant case in some respects is factually different from the *Southwest* case. However, in our opinion the basic and determining facts in the instant case are so comparable to those of the *Southwest* case as to render applicable and controlling here the principles held by the Supreme Court to be applicable and controlling there. Accordingly, we hold that since in the circumstances of this case the petitioner employed in its business real estate adjacent to the sand and gravel deposits dredged by it and the use of such real estate was indispensable to the dredging and removal of sand and gravel from such deposits, it had an economic interest in the sand and gravel which entitled it to depletion on the income from sand and gravel removed and sold.

*Decision will be entered under Rule 50.*

