VICTORY SAND AND CONCRETE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3594–71.   Filed January 2, 1974.

*Howard A. Spies* and *Barney J. Heeney, Jr.*, for the petitioner.
*George T. Morse III*, for the respondent.

DRENNEN, *Judge:** Respondent determined deficiencies in petitioner's Federal corporate income tax as follows:

| Year | Deficiency |
|---|---|
| 1967 | $2, 175. 94 |
| 1968 | 2, 487. 05 |
| 1969 | 2, 551. 57 |

The issue for decision is whether petitioner is entitled to percentage depletion deductions under sections 611 and 613 with respect to sand and gravel which it extracted from the Kansas River during the tax years at bar. Resolution depends on two subissues: (1) Whether the deposit of sand and gravel in the Kansas River must be shown to be exhaustible before petitioner may claim the allowances, and, if so, whether the deposit is, in fact, exhaustible; and (2) whether petitioner has an economic interest in its source of sand and gravel.

### FINDINGS OF FACT

Some facts have been stipulated and are so found.

Petitioner, a Kansas corporation, has its principal office and place of business in Topeka, Kans. Petitioner timely filed its tax return for the year 1967 with the district director of internal revenue at Wichita, Kans., and its returns for the years 1968 and 1969 with the Internal Revenue Service Center in Austin, Tex.

Petitioner is engaged in the business of extracting sand and gravel from the Kansas River at Topeka, Kans., and either using it in the

---

*Pursuant to a notice of reassignment sent to counsel for all parties, and to which no objections were filed, this case was reassigned by the Chief Judge on Aug. 9, 1973, from Judge Austin Hoyt to Judge W. M. Drennen for disposition.

concrete and asphalt business or selling it to others. The Kansas River is classified as navigable, so that the State of Kansas has title to the riverbed, including any natural resources therein. Petitioner's right to extract sand and gravel from the river derives from a contract with the Department of Revenue of the State of Kansas:

## CONTRACT

This contract, entered into this 17th day of May, 1965, by and between the Director of Revenue, Department of Revenue of the State of Kansas, party of the first part, and Victory Sand and Concrete, Inc., whose address is Interstate 70 & Storey St., Box 281, Topeka, Kansas party of the second part:

WITNESSETH: For the removal of sand or gravel from the bed or channel of the Kansas River on the following terms and conditions, to wit:

1. Second party agrees to make, keep and preserve a record of all sand taken from the bed or channel of such river and sold by him; such record to be made and kept in such manner and form and in such detail as may be required by the Director of Revenue or his duly authorized agent.

2. Second party agrees to make and file with the Director of Revenue by the fifteenth day of each month, a verified report of all sand taken from the bed or channel of such river and sold by second party during the preceding month, in such form as required by the Director of Revenue. The Director of Revenue reserves the right to cancel this contract, with or without notice, if second party shall neglect or refuse to report for a period of sixty days, as Provided [sic] herein.

3. Second party agrees to permit the Director of Revenue, or his duly authorized agent, to make such inspections and examinations of the books, records, papers, documents and correspondence for any such inspection or examination as the Director of Revenue or his duly authorized agent, may deem necessary and proper, and to submit any such books, records, papers, documents or correspondence for any such inspection or examination at any time on demand of the Director of Revenue or his duly authorized agent.

4. Second party agrees to pay to the Director of Revenue by the fifteenth day of the month a sum equal to two cents (2¢) for each and every ton of sand taken from the river and sold during the preceding month. For the purpose of computing into tons sales made on a cubic yard basis, a cubic yard shall be treated as weighting 2,700 pounds.

5. If at any time while this contract remains in force it shall be made to appear to the Director of Revenue that second party under this contract has not complied with this contract, the Director of Revenue, upon proper notice shall have the right to terminate this agreeemnt. The second party shall have the right to terminate the agreement at any time upon payment to the Director of Revenue of all amounts due. The State reserves the right at all times, upon five days' notice to second party, to advance or reduce the rate of royalty payable under this contract or to change the basis of the royalty, such change to take effect upon the first day of the month next following.

6. Second party agrees to comply with the orders of the Director of Revenue concerning locations, terms, and conditions under which sand shall be removed from any navigable river of the state, and will not take or remove sand from any such stream within a distance of 250 feet of any bridge or other structure crossing any such river, or to remove sand within a distance of 1500 feet above the location of the nearest plant or structure erected and maintained for purpose of taking sand from said river.

Therefore, Victory Sand & Concrete, Inc., the said party of the second part, agrees to do and perform all the conditions imposed upon him by the terms of this contract, and in the event that the said second party fails, neglects or refuses to comply with all the terms of this contract as herein imposed, then this contract and all rights and privileges inuring to the benefit of said second party shall be forever forfeited and canceled.

IN WITNESS WHEREOF, the said parties have hereunto subscribed their signatures this 17th day of May , 1965.

Petitioner also has a permit from the Division of Water Resources of the Kansas State Board of Agriculture which allows petitioner to make changes in the bed and flow of the Kansas River within a specified area along and upstream of petitioner's riverfront, but which specifically leaves authorization of the removal of sand and gravel to the State Department of Revenue:

### STATE OF KANSAS

#### STATE BOARD OF AGRICULTURE

#### DIVISION OF WATER RESOURCES

### PERMIT

The Chief Engineer of the Division of Water Resources, by virtue of the powers and duties vested in and imposed upon him by K.S.A. 82a-301 to 305, regulating the placing of obstructions in rivers and streams and providing penalties for the violation thereof, hereby issues this permit to Victory Sand & Concrete, Inc., I-70 & Storey Street, Box 281, Topeka, Kansas, pursuant to a written application filed in the office of the Division of Water Resources, State Board of Agriculture, on the 4th day of June, 1965, giving his consent to said Victory Sand & Concrete, Inc., to change in certain respects the course, current and cross section of the Kansas River while in the process of producing sand and gravel from the river bed, retaining the desired material and returning the waste materials and water to the location hereinafter described.

The proposed location of the sand plant is along the right bank of a straight reach of the Kansas River. The width of the river at the proposed site is approximately 750 feet. Sand bars which have formed along the left bank of the stream have caused the principal flow to be located in the southern two-thirds of the channel. Levees are located on both banks of the river in the area of proposed operations. The left bank is protected by a substantial growth of trees and vegetation. The right bank is protected to some extent by trees, reject concrete and oversize material placed in previous operations in the area upstream from the tipple. A considerable amount of reject concrete has been disposed along the right bank at a location near the downstream limit of removal operations, extending some distance into the channel beyond the natural bank line.

*   *   *   *   *   *   *

This permit is issued subject to the following conditions and restrictions, based upon the above-described physical condition of the river bed and banks at this location, and which shall be limitations to the rights and privileges granted, to wit:

1. The provisions of this permit apply to an area in the SE ¼ of Section 23, SW ¼ of Section 24, NW ¼ of Section 25 and NE ¼ of Section 26, all in Township 11 South, Range 15 East of the Sixth Principal Meridian in Shawnee

County, Kansas, within and along the Kansas River for a distance of approximately 1010 feet, beginning at a point opposite station 2+00 (W) and extending downstream to a point opposite station 8+10 (E), with reference to the base line shown on the plat which accompanied the application for this permit.

   *         *         *         *         *         *         *

7. This permit is issued subject to the condition that Victory Sand & Concrete, Inc., also obtain proper authority from and comply with all the requirements of the Director of Revenue, Department of Revenue, State of Kansas, covering the proposed sand pumping operations and payment of sand royalties.

8. The Chief Engineer of the Division of Water Resources further reserves the right to modify, suspend or revoke this permit at any time, should such action be deemed necessary in the interest of public safety and welfare. This permit is issued for the period ending October 13, 1966, and if not previously revoked or specifically extended, shall cease and be null and void.

This permit was extended, at petitioner's request, to October 13, 1969, at yearly intervals. Petitioner failed to request an extension for the period from October 13, 1969, to October 13, 1970, and none was granted by the State board. Petitioner nonetheless continued its dredging operations for that period, and did request an extension for the year October 13, 1970, to October 13, 1971, which was granted.

Petitioner's operations are conducted from a 19.2-acre tract within the Topeka corporate limits and with 1,155 feet of frontage on the Kansas River. This location has been used as a sand and gravel extraction site for approximately 47 years. From about 1926 until 1931, the site was used by the Johnson Sand & Gravel Co.; in 1931, it was taken over by the Victory Sand Co.; in 1963, petitioner was incorporated, and on January 1, 1964, it took over operations at the location in question. Petitioner's is not the only business extracting sand and gravel from the Kansas River in Topeka. However, there are no sites suitable for profitable dredging operations within a reasonable distance of Topeka which are not already in use for such. When petitioner purchased its present site from the Victory Sand Co., that location was the only one available to it in or around Topeka.

Johnson Sand & Gravel Co. extracted only "flow sand"—sand currently being washed downstream by the river. The company had stretched a cable across the river. A clam bucket was run across the cable and dipped into the river channel where sand flowed free of mud. The contents of the bucket were then run through a revolving screen to separate sand from other material.

When Victory Sand Co. took over operations in 1931, it began extracting sand by means of a dredging pump mounted on a barge. Petitioner uses the same method at present. A suction line with a dredging chain attached to its free end is lowered into the river. The motor-driven chain loosens the sand, which is pumped through the

line to the barge and from there, by the same pump, through a discharge line into petitioner's sand-grading plant. The discharge line is supported by pontoons and is limited in length to 200 or 300 feet, which is about the greatest distance the pump can force a stream of dredged material. Some sand producers use a "booster" pump to extend the maximum length of the discharge line. The riverbed is about 1½ miles from bluff to bluff at the upstream end of petitioner's riverfront and is no more than 500 yards across at the downstream end. The channel actually occupied by the river is slightly more than 700 feet across at petitioner's upstream property line and about 800 feet across at the downstream line. The area covered by petitioner's Division of Water Resources permit is not coextensive with its riverfront, but begins about 200 feet upstream of it and ends about 350 feet upstream of petitioner's downstream line. Due to the existence of two submerged sandbars across the river from petitioner's site, the flow of the river's principal current is approximately 450 feet wide at the upstream end of petitioner's permit area, 500 feet wide at petitioner's upstream property line, 500 feet at the downstream end of the permit area, and 550 feet at petitioner's downstream property line. Petitioner has anchor points for its barge only between its upstream property line and its sand-processing plant. The processing plant is about 350 feet below the upstream property lines—550 feet below the upstream end of the permit area—and about 800 feet above the downstream property line—450 feet above the downstream end of the permit area.

On shore, dredged material is run through a succession of wire sieves, each extracting progressively smaller particles of sand. Petitioner markets basically four grades of sand: A coarse sand or gravel, a concrete sand, a mason sand, and a fill sand. Petitioner also prepares blends of various grades of sand to customers' specifications. Petitioner sells its sand and gravel either to a subsidiary corporation, which is engaged in the concrete mix and asphalt business at the same location, or to others. Prices for petitioner's four basic marketable grades range from 70 or 75 cents per ton for fill sand to $1.75 per ton for coarse sand or gravel. Petitioner maintains a stockpile of about 25,000 tons of sand of all grades. During about 3 months in the winter, freezing conditions prevent dredging operations, and petitioner sells only from its stockpile. Petitioner's annual production for the tax years at bar averaged between 125,000 and 150,000 tons. When petitioner is replenishing certain grades in its stockpile, or dredging for certain grades to meet a customer's specification, sands of other grades which need not be stockpiled are "wasted"—fed back into the river to be carried downstream.

Prior to 1931 when petitioner's predecessor began extracting sand and gravel by the dredging and suction process, the bed of the Kansas

River in this area was virgin sand, probably deposited by glaciation, with "flow" sand on top. The virgin sand was closely packed and consisted of coarser sand and gravel than the "flow" sand. The virgin deposits within reach of petitioner's suction lines were exhausted in the early 1940's when it was used to construct a nearby Air Force base. Petitioner's present dredging operations are dependent upon replenishment of sand and gravel in the riverbed by the flow of the river. In the dredging and suction operation a hole is cut or dredged in the riverbed and sand and gravel is broken loose and sucked through a hose or pipe to a barge or the shore. When all of the material is extracted from the hole, the equipment is moved to another location where the process is repeated. These holes are refilled with sediment flowing down the river, including sand and gravel, mud, leaves, and other organic matter. Such replenishment occurs by erosion of sand and gravel deposits above Topeka by the Kansas River and its tributaries, the transport downstream of such eroded material by the river, and the deposit of such material at petitioner's operating site. The sand and gravel deposited by the flow of the river are not as coarse or as clean as the virgin sand and the quantity of marketable sand is diminished.

In about 1962 and 1967, two flood control dams were closed on tributaries of the Kansas River upstream of petitioner's permit area at Topeka. At sometime prior to the tax years at bar, seven other dams were constructed on watercourses that feed, directly or indirectly, into the Kansas River to the west, or upstream, of Topeka. These dams tend to trap 90 percent or more of the sediment, including sand and gravel, which flows downstream to them. Another effect of the dams has been to even out the flow of water coming down the Kansas River; floods have been eliminated, for the most part, and so have periods of extreme low water.

These dams have altered the flow of sand and gravel down the river, reducing it in quantity and decreasing the quantity of coarse sand and gravel in it. While petitioner and other sand and gravel operators on the Kansas River in this vicinity are still able to extract sand and gravel of sufficient grade and quantity to make their operations economically feasible, they have to return greater quantities of fill sand, which is finer and not readily marketable, to the river. About 80 miles downstream from petitioner's operation, at a sand and gravel operation near Kansas City, there has not been enough "flow" sand to replenish dredged deposits, so only virgin deposits are presently being extracted.

Mark H. Hibpshman, a geologist with the Bureau of Mines of the United States Department of Interior, made a study in 1968 of the availability of sand and gravel along the Kansas River between Junction City, Kans., which is about 70 miles upstream from petitioner's

operation, and Kansas City. On the basis of his study, Hibpshman concluded that while there were large glacial deposits of sand and gravel lying north of the Kansas River which were traversed by streams which, directly or indirectly, were tributaries of the Kansas River, he could not determine at that time whether the supply of sand and gravel to the Kansas River below the dams was being exhausted.

## ULTIMATE FINDING OF FACT

The deposit of sand and gravel in the Kansas River in petitioner's permit area was exhaustible and a depleting asset during the years here involved.

## OPINION

The only issue in this case is whether petitioner is entitled to a deduction for depletion in determining its taxable income from removing sand and gravel from the Kansas River and either selling it to a subsidiary which was to produce concrete or asphalt, or selling it to others. Petitioner claimed deductions for each of the years here involved computed as a percentage of its gross income from the sale or other disposition of the sand and gravel removed. Respondent disallowed the entire amount of the deductions claimed.

Respondent bases his disallowance of the deductions on two arguments: (1) That petitioner did not have the requisite economic interest in the sand and gravel in the Kansas River to entitle it to the depletion deduction, and (2) the sand and gravel in petitioner's permit and operating area is not exhausted by extraction and, therefore, does not qualify as a depletable asset. Petitioner counters with the arguments: (1) That it has an economic interest in the sand in the river obtained by its investment in the land adjacent to the river used for extraction of the sand and by its exclusive permit and contract from the State of Kansas for removing the sand, and (2) that a percentage depletion deduction is allowed for the extraction and sale of sand under section 613(b)(6)[1] regardless of whether it is exhausted by extraction, but in any event, the marketable grades of sand are being exhausted by extraction and, therefore, the sand is a depletable asset.

For reasons hereinafter stated, we agree with petitioner, although the conclusion is not entirely free of doubt.

Section 611(a) provides that in case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion, to be determined under regulations prescribed by the Secretary

---

[1] All section references are to the Internal Revenue Code of 1954, unless otherwise indicated..

or his delegate. Section 613(a) provides that in the case of mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be a percentage, specified in subsection (b), of the gross income from the property, which is defined in subsection (c) as the gross income from mining. Section 613(b) provides that the mines, wells, and other natural deposits, and the percentages, referred to in subsection (a), are as set forth in the seven paragraphs following, paragraph (6) of which allows 5 percent for "sand" and other minerals listed therein.

The basic precepts upon which the allowance of a deduction for depletion are based have been stated in so many cases that we need do no more than allude to them here, limiting our discussion to those which must resolve the issue before us.

The depletion deduction is a matter of legislative grace. It is allowed in recognition of the fact that mineral deposits are wasting assets and that the extraction of the minerals gradually exhausts the capital investment in the mineral deposit. It was designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted the owner's capital is unimpaired. It was originally geared to cost, i.e., allocation of the total investment among the total quantity of units in the deposit and allowance of a deduction for the part of the investment allocated to the units removed. The granting of an arbitrary deduction based on a percentage of gross income from the property, the percentage depletion now provided under section 613, was in the interest of convenience and in no way altered the fundamental theory of the allowance. *Helvering* v. *Bankline Oil Co.*, 303 U.S. 362 (1938); *Commissioner* v. *Southwest Expl. Co.*, 350 U.S. 308 (1956). However, percentage depletion—

bears little relationship to the capital investment, and the taxpayer is not limited to a recoupment of his original investment. The allowance continues so long as minerals are extracted, and even though no money was actually invested in the deposit. * * * [*Commissioner* v. *Southwest Expl. Co., supra.*]

To be entitled to the depletion deduction, the taxpayer must have an interest in the mineral deposit, although it has long been recognized that the deduction is not dependent upon the particular legal form of the taxpayer's interest in the property to be depleted. In *Palmer* v. *Bender*, 287 U.S. 551 (1933), the Supreme Court recognized that an economic interest in the property is sufficient and referred to such interest as one in which "the taxpayer has acquired, * * * by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." This terminology has been adopted as the definition of "economic interest" by the courts, *Paragon Coal Co.* v. *Commissioner*, 380 U.S. 624 (1965); *Commissioner* v. *Southwest Expl. Co., supra,* and in the regulations, sec. 1.611–

1(b)(1). The principal issue arising in depletion cases since *Palmer* v. *Bender, supra,* has been whether the taxpayer, under varying circumstances, possessed such an economic interest as would entitle him to the depletion deduction. *Robert Lee Merritt,* 39 T.C. 257 (1962), revd. 330 F. 2d 161 (C.A. 4, 1964), revd. sub nom. *Paragon Coal Co.* v. *Commissioner,* 380 U.S. 624 (1965).

In a series of cases decided in 1938 the Supreme Court determined that the interest in the mineral deposit must be direct (i.e., a stockholder of a corporation having such interest does not qualify), *Helvering* v. *O'Donnell,* 303 U.S. 370 (1938), that a taxpayer who disposes of his interest in mineral properties by sale does not retain the requisite economic interest even though as part payment he receives a percentage of the net profits from production of the minerals by the buyer, *Helvering* v. *Elbe Oil Land Co.,* 303 U.S. 372 (1938), and that the phrase "economic interest" does not embrace a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital interest in the mineral deposit, *Helvering* v. *Bankline Oil Co., supra.* The latter principle was applied in denying depletion deductions to contract coal miners who mined the coal for the owner of the economic interest in the coal in place and delivered it to the owner for a fixed price in *Parsons* v. *Smith,* 359 U.S. 215 (1959), and *Paragon Coal Co.* v. *Commissioner, supra.* In *Parsons* v. *Smith, supra,* the Court listed seven facts upon which it based its conclusion that the contract miners did not possess the requisite economic interest in the minerals in place for a depletion deduction, which have been used as guidelines in subsequent cases, see *Lesta Ramey,* 47 T.C. 363 (1967), affd. 398 F. 2d 478 (C.A. 6, 1968), *Charles P. Mullins,* 48 T.C. 571 (1967), and *Bakertown Coal Co., Inc.* v. *United States,* 485 F. 2d 633 (Ct. Cl. 1973), and which will be referred to later herein.

And, finally, in somewhat of a departure from precedent, the Supreme Court held in *Commissioner* v. *Southwest Expl. Co., supra,* that upland owners who had no direct interest in the minerals in place but whose land was essential to the drilling for and extraction of offshore oil and who contributed the use of that land in return for a share of the net profits from the production of that oil thereby acquired an economic interest which entitled them to depletion on the income thus received. Several years later, this Court, in *Oil City Sand & Gravel Co.,* 32 T.C. 31 (1959), appeal dismissed, in complete reliance on the *Southwest Expl. Co.* case, held, under facts very similar to the facts in this case, that a taxpayer who was extracting sand and gravel from the bed of the Allegheny River under a permit from the State of Pennsylvania had an economic interest in the sand and gravel deposits which entitled it to depletion by virtue of its ownership of the only

land adjacent to the sand deposits which could be used, and were used, in the extraction and production process. These two cases are the only cases we have been able to find which have allowed depletion deductions to taxpayers who did not have, or *may* not have had, in the *Oil City* case, a direct interest in the minerals being produced.

The facts and circumstances in this case are so similar to those in the *Oil City* case that that case, backed by the principle enunciated in the *Southwest Expl. Co.* case, is ample authority for us to conclude here that petitioner had an economic interest in the sand and gravel deposits which it extracted by virtue alone of its ownership of the tract of land adjacent to the riverbed deposits which, the evidence shows, was the only land available from which these deposits could be extracted and which petitioner contributed to the extraction and production process. Respondent, on brief, attempts to distinguish the *Oil City* case from this case on the facts, but fails to do so.

In addition, however, we find that petitioner had an economic interest in the deposits from which it removed the sand and gravel without reliance on the principle espoused in the above two cases. Petitioner operated on the Kansas River removing sand and gravel under a permit issued by the Kansas State Board of Agriculture, Division of Water Resources, and under a contract with the Kansas Department of Revenue. The permit extended for a period of only 1 year but was renewable annually, and provided that the division's chief engineer may "modify, suspend or revoke the permit at any time, should such action be deemed necessary in the interest of public safety." Respondent relies on the latter provision in arguing that petitioner's interest in the deposit was terminable on short notice without cause and, therefore, does not qualify as an economic interest under the third (3) factor set forth in *Parsons* v. *Smith, supra,* and relied on by this Court in disallowing depletion deductions in *Lesta Ramey, supra,* and *Charles P. Mullins, supra.* See, however, *Bakertown Coal Co., Inc.* v. *United States, supra.* First, the right of a State officer to terminate for purposes of public safety is not the type of termination clause referred to in the above cases; we assume that the proper State officer might close down a mining operation in the interest of public safety regardless of the terms of a lease. In any event, respondent's argument fails because petitioner's right to remove sand and gravel from the Kansas River depends upon its contract with the State Department of Revenue and not upon the permit.[2] Kan. Stat. Ann. secs. 70a–101, 70a–102 (1972) ; *Dreyer* v. *Siler,* 180 Kan. 765, 308 P. 2d 127 (1957). That contract is not terminable without cause on short notice; it bears no termination date, and may be abrogated by the State only upon failure by petitioner to com-

---

[2] We note that petitioner operated 1 year without a permit.

ply with its reporting and royalty payment requirements and other express provisions. At most, the permit affects the manner in which petitioner must exercise its right—in a fashion similar to Government-imposed safety regulations in a mine, for example—not the existence of the right itself. Furthermore, the State law provides that no one else may remove sand and gravel from the river within 1,500 feet of petitioner's operation, which gives petitioner the exclusive right to extract the mineral from its designated area.

Referring to some of the other factors set forth in *Parsons* v. *Smith*, *supra*, as guidelines for determining whether a taxpayer has an economic interest that qualifies for the depletion deduction, we find: That petitioner's investment was not all in movable equipment but was also in the land and the sand and gravel in place which was not recoverable through depreciation; that the State surrendered to petitioner its interest in the sand and gravel that was removable by extraction; that the sand and gravel, after it was removed, belonged entirely to petitioner, there was no requirement that any part of it be delivered to the State, and petitioner was free to sell or use it in any way it wanted, and had to look solely to the proceeds of its sale of the sand and gravel for a return of its investment. We think it is clear that petitioner had an economic interest in the sand and gravel in place; more so even than did petitioner in the *Oil City* case.

This does not provide the final answer to the issue before us, however, because respondent argues that the sand and gravel in the riverbed was constantly being replenished by the flow of the river and hence does not qualify as a depletable asset. Petitioner claims first that a depletion deduction for sand is allowed under section 613(b)(6)(A) without reference to exhaustibility, as is made in paragraph (b)(7)(B), so the question of exhaustibility is irrelevant; but if it is relevant, the sand and gravel of the grade petitioner can use is not inexhaustible. We disagree with petitioner's first contention but agree with its second contention.

Section 613 does not provide the deduction for depletion; it simply provides a method of computing depletion, based on percentages of gross income from mining, and sets forth the percentages to be used with respect to the various minerals listed therein. The depletion deduction is provided by section 611(a) which "allow[s] as a deduction * * * a reasonable allowance for depletion * * * according to the peculiar conditions in each case." This language does not specifically provide the answer to the question either, and we find nothing in the legislative history of these statutory provisions which does so with certainty. Nevertheless, the courts and the regulations appear to have assumed that exhaustibility is a precondition for the allowance of a depletion deduction, and this appears to be justified.

The deduction is an allowance for "depletion." "Depletion" is defined in Webster's Dictionary as the "act of depleting, or state of being depleted. *Accounting*. Impairment of capital." "Deplete" is defined— "2. To reduce by destroying or consuming; * * * to exhaust." Certainly, in common understanding, an allowance for depletion would mean an allowance for reducing the quantity of a limited or exhausting supply, and that is what we believe Congress intended the allowance to mean.

Petitioner argues that when Congress added paragraph (7) to section 613(b) [3] providing the percentage rate of depletion for "all other minerals" and in subparagraph (B) provided that "all other minerals" does not include "minerals from sea water, the air, or similar inexhaustible sources" it evidenced an intent to make exhaustibility a criterion only for "all other minerals." We disagree. We think that if any implication can be drawn from the use of the word "inexhaustible" in paragraph (7)(B), it is that Congress was recognizing that depletion is allowable only in the case of exhaustible mineral deposits; otherwise, there would have been no reason to differentiate between other minerals for which depletion is allowed and minerals from "similar inexhaustible sources" for which depletion is not allowed. In addition, we think that the last sentence of section 613(b) makes sense only if Congress considered exhaustibility to be a general prerequisite to percentage depletion. Otherwise, there would be no reason for Congress to have made the sentence, with its reference to "an inexhaustible source," apply to all of section 613(b) instead of merely to section 613(b)(7) or to make reference to sodium chloride, covered by section 613(b)(4) and thus beyond the reach of section 613(b)(7).

See also the report of the Staffs of Joint Committee on Internal Revenue Taxation and Senate Committee on Finance, 91st Cong., 1st Sess., Summary of H.R. 13270, Tax Reform Act of 1969, pp. 75–76, wherein it was stated:

*Present law.*—At present, percentage depletion is granted to a wide range of minerals. * * * Percentage depletion is not granted in the case of soil * * * or minerals from sea water, the air, or similar inexhaustible sources.[4]

The regulations also contain a reference to exhaustible resources. Section 1.611–1(a), Income Tax Regs., reads in part:

Section 611 provides that there shall be allowed as a deduction * * * in the case of * * * other natural deposits * * * a reasonable allowance for depletion. * * * In

---

[3] Sec. 613(b)(7):

(7) 14 percent—all other minerals * * *. For purposes of this paragraph, the term "all other minerals" does not include—

    (A) soil, sod, dirt, turf, water, or mosses; or

    (B) minerals from sea water, the air, or similar inexhaustible sources.

For purposes of this subsection, minerals (other than sodium chloride) extracted from brines pumped from a saline perennial lake within the United States shall not be considered minerals from an inexhaustible source.

[4] But compare H. Rept. No. 91–413 (Part I), 91st Cong., 1st Sess., pp. 136–138 (1969), as to the scope of the requirement of exhaustibility.

the case of other exhaustible natural resources the allowance for depletion shall be computed * * *

Subparagraph (d) (5) of the regulation, in defining minerals, states:

"Minerals" includes ores of the metals, coal, oil, gas, and all other natural metallic and nonmetallic deposits, except minerals derived from sea water, the air, or from similar inexhaustible sources. * * *

And finally, as heretofore stated, the cases refer time and again to "wasting assets," "depletable assets," and "exhaustion of assets" in discussing the allowance for depletion. In *Helvering* v. *Bankline Oil Co.*, 303 U.S. 362, 366–367 (1938), the Supreme Court, in referring to the fundamental purpose of the depletion allowance, said:

It is permitted in recognition of the fact that the mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production. *United States* v. *Ludey*, 274 U.S. 295, 302. * * *

In *Commissioner* v. *Southwest Expl. Co.*, 350 U.S. 308, 312 (1956), the Court said:

An allowance for depletion has been recognized in our revenue laws since 1913. It is based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit. Presently, the depletion allowance is a fixed percentage of gross income which Congress allows to be excluded; this exclusion is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired. * * *

In *Paragon Coal Co.* v. *Commissioner*, 380 U.S. 624, 631 (1965), the Court again said:

This Court has often said that the purpose of the allowance for depletion is to compensate the owner of wasting mineral assets for the part exhausted in production, so that when the minerals are gone, the owner's capital and his capital assets remain unimpaired. * * *

And, in *Arthur E. Reich*, 52 T.C. 700, 711 (1969), affd. 454 F. 2d 1157 (C.A. 9, 1972), this Court found it necessary to determine whether the supply of geothermal steam there involved was an exhaustible natural resource, stating:

The third question is whether the steam at The Geysers is an exhaustible resource. It is undisputed that if the steam is inexhaustible, Thermal is not entitled to an allowance for depletion. * * *

In all of the above cases, the minerals involved were of the kind specifically mentioned in the first six paragraphs of section 613(b), as is the sand in this case. We conclude that in order for petitioner to be entitled to a depletion deduction the sand and gravel being extracted by petitioner must be subject to exhaustion and the question whether it is or is not is quite relevant and material to the disposition of this

issue. So we must determine whether the minerals being extracted by petitioner are depletable assets.

In *Oil City Sand & Gravel Co.*, 32 T.C. 31, 33 (1959), this Court made the following finding of fact:

The material (sand and gravel) composing the riverbed deposits which the petitioner has dredged and continues to dredge was deposited by glacial action. Once such deposits are removed or exhausted they are not replaced to any extent by action of the river. The river merely deposits mud in the places from which such deposits were removed and there is no market for mud.

Apparently respondent made as his principal argument in that case that petitioner had no economic interest in the sand and gravel, and did not press an argument that the sand and gravel was not a depleting asset, because we are unable to determine from the opinion the basis for the above finding that the riverbed deposits there involved, once removed or exhausted, are not replaced to any extent by action of the river. In the trial of this case most of the testimony of the witnesses was directed to this point, and we must decide this case on the evidence presented. Unfortunately, the evidence presented was not conclusive and, as we stated in *Arthur E. Reich*, *supra*, the question presented, involving the resolution of geological and engineering disputes, is a difficult one for a judicial body. While, fortunately, the question of exhaustibility and replenishment should not be involved in most of the mineral deposits mentioned in section 613(b), simply because of their nature, section 611(a) does appear to recognize that unspecified questions such as this might affect the right to a depletion allowance by inclusion of the words "according to the peculiar conditions in each case."

The evidence in this case reveals that the Kansas River at the location of petitioner's permit area runs from west to east and lies just north of the southern limit of glaciation. As indicated on the geological survey map introduced in evidence, most of the land lying within 100 miles north of the river consists of "drift," "till." Geologically, "drift" is defined as:

any rock material, such as bowlders, till, gravel, sand, or clay, transported by a glacier and deposited by or from the ice or by or in water derived from the melting of the ice.

"Till" is defined as:

that part of a glacial drift consisting of material deposited by and underneath the ice, with little or no transportation and sorting by water; it is a generally unstratified, unconsolidated, heterogeneous mixture of clay, sand, gravel, and bowlders. [See "A Glossary of the Mining and Mineral Industry," Bull. 95, U.S. Department of the Interior.]

There are several rivers and smaller streams which traverse this area and eventually become tributaries of the Kansas River upriver from petitioner's location. However, in 1962 and 1967 two flood control dams were closed on the tributaries of the Kansas River upstream of peti-

tioner's location and at some time before the tax years at bar, seven other dams were constructed on watercourses that feed, directly or indirectly, into the Kansas River above petitioner's location. According to the testimony of a witness from the engineering division, water control section, of the Corps of Engineers located in Kansas City, these dams tend to trap 90 percent or more of the sediment, including sand and gravel, which flows downstream to them. They also even out the flow of water coming down the river, eliminating for the most part floods and periods of extreme low water.

We glean from the evidence that the sand and gravel deposits in this area of Kansas were originally glacial deposits; that the dryland surface consists of very fine sand or a sandy loam, that the sand gets coarser the deeper one goes from the surface, and that the consistency becomes that of gravel as one approaches the water table level, at a depth of 25 to 30 feet below the surface. Prior to 1931, when petitioner's predecessor started mining the sand at this location by dredging and suction pumps, the bed of the river consisted of virgin sand which was firmly packed and was a coarse sand and gravel. In mining this virgin sand the miner drilled or dredged a hole in the riverbed and extracted the material, moving to various locations within the permit area as the virgin sand was exhausted. Prior to construction of the dams and levees upstream, the holes would refill with material brought downstream by the flow of the river; but this material was for the most part a finer grade of sand than the virgin sand and often contained mud, leaves, and other organic matter. When these holes were pumped out, the extraneous matters were screened out and sand and gravel was extracted, but it was of a finer grade, and much of it was not salable and was dumped back into the river. When the dams were built much less suspended sediment flowed downstream, and the grade of the refill sand became even finer. However, sand miners have been able to extract, up through the years here involved, enough sand of sufficient grade and quality to make their operations economically feasible.

The obtainable virgin sand at petitioner's location was mined out in the early 1940's when it was used to build a nearby Air Force base. Consequently, petitioner has been extracting mostly refill sand and gravel since it took over the operation in 1964. It was not known at the time of the trial whether the river at petitioner's location would continue to deposit sand and gravel of sufficient grade and quality in petitioner's permit area to make it economically feasible for petitioner to continue its operations at that location for any extended length of time. While some of the sand and gravel from the "drift" or "till" deposits north of the river might eventually wash down to petitioner's permit area to replenish the sand and gravel extracted, the testimony of the geologist-witness who made a survey and report on the subject in 1968 or 1969 was to the effect that the quality and quantity of such

replacement, and the time it would take, could not be determined at that time.

Based on the evidence presented and our research on the purpose for the allowance of a deduction for depletion, we think the sand in petitioner's permit area of the Kansas River must be considered exhausting and a depletable asset within the meaning of sections 611 and 613, particularly for percentage depletion purposes. The legislative history of the evolution of percentage depletion from cost and discovery depletion, to oil and gas in 1926, and then to include almost all minerals and mineral deposits under present law, indicates that various economic factors, such as the encouragement of exploration for and production of needed materials, the relief of depressed industries, employment, and competition, have been a major consideration in the extension of the allowances by Congress. Consequently, we think we should take a practical economic approach in determining whether petitioner's mineral deposit is a depletable asset within the intendment of Congress. See *Commissioner* v. *Southwest Expl. Co.*, 350 U.S. 308 (1956).

It is true that petitioner's sand deposit is replenished to some extent by the flow of the river, but the evidence indicates that it is not being replenished with the same grade, quality, and quantity of sand that has been extracted, and that the grade and quality of the replenishment sand is diminishing, particularly since the advent of the flood control and water conservation dams upstream. The virgin sand has been exhausted and would not be replaced, even if all extraction processes stopped, for many years. (We assume this is what the Court had reference to in its findings of fact in *Oil City Sand & Gravel Co.*, 32 T.C. 31 (1959), referred to above.) Economically, it should not be necessary that a mineral deposit be subject to complete physical exhaustion to qualify for the depletion allowance; if the mineral supply is being diminished in quantity or quality so as eventually to make it economically unfeasible to extract a marketable product, it will qualify as a wasting asset for depletion purposes. Under the circumstances, we find that petitioner's investment in the sand deposit, and its economic interest therein, is being depleted as each ton of sand and gravel is extracted, that the deposit is a wasting asset, and that petitioner is entitled to the percentage depletion deduction with respect thereto.

We find support for this conclusion in *United States* v. *Ludey*, 274 U.S. 295 (1927), in which the question was whether the basis in an oil deposit had to be reduced by depletion. The taxpayer argued that the oil deposit should not be depleted because oil is a fugacious mineral and it cannot be known that the reserve had been diminished by the operation of the wells. In rejecting this argument, the Court said:

Perhaps some land may be discovered which, like the Widow's cruse, will afford an inexhaustible supply of oil. But the common experience of man has been

that oil wells, and the territory in which they are sunk, become exhausted in time. Congress in providing for the deduction for depletion of oil wells acted on that experience. * * *

Don C. Day, 54 T.C. 1417 (1970), while involving a different issue, also supports our conclusion. In that case respondent argued that since the water in the Ogallala water reservoir in Texas would be replenished by seepage of water underlying adjoining properties, the sale of the rights to use water under a taxpayer's property for a term of years was not the sale of the entire interest in the water. This Court, in holding against respondent, referred to United States v. Ludey, supra, and United States v. Shurbet, 347 F. 2d 103 (C.A. 5, 1965), as recognition of the fact that because mineral deposits might be replenished from adjoining lands did not make them inexhaustible assets.

Finally, we note that Congress' specific purpose in enacting the last sentence of section 613(b), supra, was to reverse Rev. Rul. 65-7, 1965-1 C.B. 254, in which respondent had determined that saline minerals in the Great Salt Lake were inexhaustible because continuously replenished by dissolved salts carried in each year by streams. Congress determined that such replenishment had been diminished by water conservation practices and that percentage depletion was appropriate. See, e.g., S. Rept. No. 91-552, 91st Cong., 1st Sess., p. 181 (1969).

We conclude that this petitioner had an economic interest in the sand deposit in the Kansas River within its permit area during the years here involved, which was a wasting asset, and petitioner is entitled to deduct the allowance for depletion with respect to that deposit provided in section 613(b)(6).

*Decision will be entered for the petitioner.*

Reviewed by the Court.

RAUM, J., dissents.

---

QUEALY, J., dissenting: Assuming that the petitioner had an economic interest in the sand and gravel which he was licensed to remove from the Kansas River, in order to be entitled to percentage depletion it was incumbent on petitioner to prove that the deposit was exhaustible. The record will not support such a finding.

The sand and gravel which was being taken from the Kansas River by the petitioner was not the original so-called virgin sand, but materials which had been deposited on the riverbed since that sand had been removed some 25 years before. The process of replenishment had been going on ever since. Thus, in the opinion of the majority, it is stated:

Mark H. Hibpshman, a geologist with the Bureau of Mines of the United States Department of Interior, made a study in 1968 of the availability of sand and gravel along the Kansas River between Junction City, Kans., which is about 70 miles upstream from petitioner's operation, and Kansas City. On the basis of

his study, Hibpshman concluded that while there were large glacial deposits of sand and gravel lying north of the Kansas River which were traversed by streams which, directly or indirectly, were tributaries of the Kansas River, he could not determine at that time whether the supply of sand and gravel to the Kansas River below the dams was being exhausted.

No proof could be offered that the deposits would, in fact, be exhausted at any time in the future. Absent such proof, the petitioner cannot prevail.