**MISSOURI PACIFIC CORPORATION**

v.

**The UNITED STATES.**

No. 540–78.

United States Claims Court.

May 10, 1984.

William D. Crampton, St. Louis, Mo., for plaintiff. Juan D. Keller, John A. Newman, and Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., of counsel.

Paul Wright, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D.C., of counsel.

## OPINION

PHILIP R. MILLER, Judge:

Plaintiff, Missouri Pacific Corporation ("MoPac"), the parent corporation of an affiliated group of corporations, filed suit to recover an aggregate of $577,251 in federal income taxes paid for the tax years 1966 through 1971, plus interest. The case presents two distinct issues. The first, is whether plaintiff was entitled to percentage depletion deductions claimed by Stewart Sand and Material Company (Stewart), one of the affiliated group of corporations. The second issue is whether payments made by the plaintiff in settlement of a class action brought by its stockholders, were ordinary and necessary business expenses under § 162 of the Internal Revenue Code of 1954.[1]

I. *Sand and Gravel Depletion.*

*Facts*

During the years 1966–69, Stewart was engaged in the business of selling sand, gravel and ready-mix concrete in Kansas City, Missouri. It obtained part of its sand and gravel by dredging it from the Missouri River in Kansas City. It had no exclusive right to this sand and gravel and was not obligated to pay the State of Missouri,

the federal government, Kansas City nor anyone else for it.

The only permit it was required to obtain was from the Army Corps of Engineers, to perform work in or affecting navigable waters of the United States, pursuant to Section 10 of the Rivers and Harbors Act of March 3, 1899 (33 U.S.C. § 403), and to discharge dredged or fill material into navigable waters, pursuant to Section 404 of the Federal Water Pollution Control Act of 1972 (86 Stat. 816, Pub.L. 92–500). The permit authorized such work to be done, as proposed by Stewart, between river miles 363.0 (0.7 miles upstream from the Chouteau Bridge, Kansas City), and 371.0 (4.8 miles upstream from the Broadway Bridge, Kansas City). The permittee agreed therein that if its activities involved a discharge or deposit into navigable waters that it would be consistent with applicable water quality standards, effluent limitations and other standards and prohibition of the Federal Water Pollution Control Act. It agreed to prosecute the authorized work in a manner so as to minimize any adverse impact on fish, wildlife and environmental values and so as to minimize any degradation of water quality. The permittee further agreed to have a plan for the prevention and control of oil spills, not to dredge within specified distances of levees, bridges, water intakes, and river banks; to dredge only on the Missouri side of the boundary between Missouri and Kansas; and to turn over any historic or archaeological artifacts it might find in its dredging to the National Park Service. The permit denied the permittee authority to interfere with any federal project and to prevent full and free public use of the navigable waters. The document specifically stated: "That this permit does not convey any property rights either in real estate or material." The permit was effective for a 3-year period and renewed every 3 years.

In furtherance of its operations, during the years at issue, Stewart leased from the

---

1. Unless otherwise specified all statutory references are to the Internal Revenue Code of 1954, as amended to the years at issue.

municipality of Kansas City, in the vicinity of river mile 365.0, approximately 3 acres of land having 634 feet of river frontage, for rentals of $1,800 per annum under a 20-year lease terminating February 29, 1968, and $2,600 per annum under a 15-year lease thereafter. The leases provided that the "leased premises shall be used for the purpose of unloading, preparing, storing, handling, manufacturing and reloading sand and other building materials", and Stewart in fact set up facilities on such land for such purposes which it designated as its Grand Avenue plant.

Although, as previously noted, the Corps of Engineers approved plaintiff's application for a permit to dredge sand and gravel from the Missouri River between river miles 363.0 and 371.0, in fact, Stewart only dredged sand and gravel for commercial purposes from the portion of the riverbed located one and one-half miles upstream and downstream from the Grand Avenue plant unloading facility in the vicinity of river mile 365.0.

Besides Stewart, at least four other companies had Corps of Engineers permits to engage in commercial sand and gravel dredging operations in portions of the Missouri River which overlapped the portion in which Stewart was permitted to operate. Missouri City Stone Company had a permit to conduct commercial sand and gravel dredging operations between river miles 300.0 and 387.0 and operated unloading facilities at river miles 317.0, 347.0 and 380.0. Kansas City Quarry Company had a permit to engage in similar dredging operations between river miles 366.2 and 373.2 and owned an unloading facility at river mile 371.4, which it has not used for the last 15 years. Rulo Sand and Gravel, Inc., held a similar permit applicable between river miles 370.0 and 380.0 and used the Kansas City Quarry Company unloading facility at river mile 371.0. Holiday Sand & Gravel Company's permit covered the stretch of the river between river miles 352.0 and 372.0, and its unloading facility was at river mile 362.5. Although at least three of these companies had permits to engage in sand and gravel dredging operations, in the stretch of the river in which Stewart actually operated during the years at issue, Stewart was the only company which dredged sand and gravel for commercial use one and one-half miles upstream and downstream of its unloading facility on the Missouri River.

In audits of plaintiff's income tax returns for the years 1967–71, the Internal Revenue Service disallowed plaintiff's percentage depletion deductions for sand and gravel dredged by Stewart in the Missouri River. Plaintiff paid the deficiencies and duly filed claims for refund therefor.

*Discussion*

Section 611(a) of the Internal Revenue Code of 1954 (I.R.C.) provides that in the case of mines, oil and gas wells and other natural deposits there shall be allowed as a deduction in computing taxable income "a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case." Section 613(a) and (b) in turn provides that the allowance for depletion in the case of mines, wells and other natural deposits shall be a specified percentage of the gross income from the property, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property, but not to exceed 50 percent of the taxpayer's taxable income from the property. The specified percentage for sand and gravel is 5 percent.

The basis theory underlying the depletion allowance was aptly put by Mr. Justice Brandeis in *United States v. Ludey*, 274 U.S. 295, 302, 47 S.Ct. 608, 610, 71 L.Ed. 1054 (1927):

The depletion charge permitted as a deduction from the gross income in determining the taxable income of mines for any year represents the reduction in the mineral contents of the reserves from which the product is taken. The reserves are recognized as wasting assets. The depletion effected by operation is likened to the using up of raw

material in making the product of a manufacturing establishment. As the cost of the raw material must be deducted from the gross income before the net income can be determined, so the estimated cost of the part of the reserve used up is allowed. The fact that the reserve is hidden from sight presents difficulties in making an estimate of the amount of the deposits. The actual quantity can rarely be measured. It must be approximated. And because the quantity originally in the reserve is not actually known, the percent of the whole withdrawn in any year, and hence the appropriate depletion charge, is necessarily a rough estimate. But Congress concluded, in the light of experience, that it was better to act upon a rough estimate than to ignore the fact of depletion.

*Ludey* involved 1917 income taxes. In 1918,[2] Congress changed the law so that the capital to be recovered by the depletion allowance was not limited by the owner's investment in the minerals but rather could be measured by the fair market value of the property at the date the mineral deposits were "discovered." Starting in 1926,[3] Congress allowed taxpayers the privilege of computing depletion for oil and gas deposits as a percentage of gross income rather than cost or discovery value. Beginning in 1932,[4] it allowed percentage depletion at different percentages for coal, metal mines, and sulphur. This was gradually expanded to cover other minerals, sand and gravel at 5 percent of gross income being added by the Revenue Act of 1951.[5] However, on a number of occasions the Supreme Court stated that these alterations in the method of computation of depletion did not change the basic theory of the allowance. Typical of such statements is the following from *Helvering v. Bankline Oil Co.*, 303 U.S. 362, 366–67, 58 S.Ct. 616, 617–18, 82 L.Ed. 897 (1938):

In order to determine whether respondent is entitled to depletion with respect to the production in question, we must recur to the fundamental purpose of the statutory allowance. The deduction is permitted as an act of grace. It is permitted in recognition of the fact that the mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production. * * The granting of an arbitrary deduction, in the case of oil and gas wells, of a percentage of gross income was in the interest of convenience and in no way altered the fundamental theory of the allowance. * * * The allowance is to the recipients of this gross income by reason of their capital investment in the oil or gas in place. [Citations omitted.]

From *Anderson v. Helvering*, 310 U.S. 404, 408, 60 S.Ct. 952, 954, 84 L.Ed. 1277 (1940):

The depletion effected by production is likened to the depreciation of machinery or the using up of raw materials in manufacturing. * * * The deduction * * * is intended as compensation for the capital assets consumed in the production of income through the severance of the minerals. * * * The granting of an arbitrary deduction, in the interests of convenience, of a percentage of the gross income derived from the severance of oil and gas, merely emphasizes the underlying theory of the allowance as a tax-free return of the capital consumed in the production of gross income through severance. [Citations omitted.]

And from *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 602–03, 66 S.Ct. 409, 410–11, 90 L.Ed. 343 (1946):

In theory the aggregate sum allowed for depletion would equal the value of the natural resource at the time of its acquisition by the taxpayer, so that at the exhaustion of the resource the taxpayer

---

**2.** Revenue Act of 1918, ch. 18, § 214(a)(10), 234(a)(9), 40 Stat. 1068, 1078.

**3.** Revenue Act of 1926, ch. 27, § 204(c), 44 Stat. (Part 2) 16.

**4.** Revenue Act of 1932, ch. 209, § 114(6)(4), 47 Stat. 203.

**5.** Internal Revenue Code of 1939, Sec. 114(b)(4)(A), as amended by the Revenue Act of 1951, ch. 521, § 319(a), 65 Stat. 452.

would have recovered through depletion exactly his investment. The administrative difficulties in taxation of oil and gas production in view of the uncertainties of quantities and time of acquisition, that is at the purchase of the property or at the discovery of oil or gas, finally have brought Congress to the arbitrary allowance of 27½ per cent now embodied in § 114(b)(3). Thus, the 27½ per cent is appropriated by the statute to the restoration of the taxpayer's capital and the rest of the proceeds of the natural asset becomes gross income. * * * *It follows from this theory that only a taxpayer with an economic interest in the asset, here the oil, is entitled to the depletion. * * * By this is meant only that under his contract he must look to the oil in place as the source of the return of his capital investment. * * * The test of the right to depletion is whether the taxpayer has a capital investment in the oil in place which is necessarily reduced as the oil is extracted.* [Emphasis added and citations omitted.]

And *see also Parsons v. Smith,* 359 U.S. 215, 220–21, 79 S.Ct. 656, 660–61, 3 L.Ed.2d 747 (1959); *Helvering v. Twin Bell Oil Syndicate,* 293 U.S. 312, 321, 55 S.Ct. 174, 178, 79 L.Ed. 383 (1934); and *United States v. Dakota-Montana Oil Co.,* 288 U.S. 459, 467 (1933).

Although, as may be observed from the quoted language, the Supreme Court spoke of the need for a "capital investment" in the mineral deposit as a requirement for the depletion allowance, in two more recent decisions it expanded the concept to include not merely the taxpayer's cost but any economic interest in the deposit, no matter how acquired and in whatever form, which is subject to exhaustion by the extraction. In *Commissioner v. Southwest Expl. Co.,* 350 U.S. 308, 312, 76 S.Ct. 395, 397, 100 L.Ed. 347 (1956), the Court described the percentage depletion allowance as follows:

An allowance for depletion has been recognized in our revenue laws since 1913. It is based on the theory that the extraction of minerals gradually exhausts the capital investment in the min-

eral deposit. Presently, the depletion allowance is a fixed percentage of gross income which Congress allows to be excluded; this exclusion is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired. The present allowance, however, bears little relationship to the capital investment, and the taxpayer is not limited to a recoupment of his original investment. The allowance continues so long as minerals are extracted, and even though no money was actually invested in the deposit.

In *United States v. Swank,* 451 U.S. 571, 577, 101 S.Ct. 1931, 1935, 68 L.Ed.2d 454 (1981), the Court, relying on similar reasoning and quoting from *Southwest Exploration,* concluded that "eligibility for the deduction is determined not by the amount of the capital investment but by the mine operator's 'economic interest' in the coal", and it also found support for that conclusion in the fact that Congress had not merely permitted a shift from cost depletion to percentage depletion but in the interim period, from 1918 to 1926, it had allowed taxpayers to take depletion allowances based on the appreciated discovery value of their mineral lands. (*Id.* 451 U.S. at 577, n. 9, 101 S.Ct. at 1935.)

However, even in *Swank* the Court did not treat the percentage depletion deduction as a rootless and arbitrary allowance or subsidy to mineral producers, unrelated to the original purpose of the depletion allowance. For, with respect to the meaning of "economic interest", the Court reiterated (451 U.S. at 577 n. 10, 101 S.Ct. at 1936) the test used to define an "economic interest" in *Palmer v. Bender,* 287 U.S. 551, 557, 53 S.Ct. 225, 226, 77 L.Ed. 489 (1933), almost 50 years earlier:

The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the ex-

traction of the oil, to which he must look for a return of his capital.

And it also quoted with seeming approval from *Helvering v. Bankline Oil Co.*, 303 U.S. at 366–67, 58 S.Ct. at 617–18, that "[t]he granting of an arbitrary deduction * * * of a percentage of gross income was in the interest of convenience and in no way altered the fundamental theory of the allowance." (*Swank*, 451 U.S. at 577, n. 9, 101 S.Ct. at 1935.)

Summarizing the investment requirement in both the Supreme Court and lower court cases, F. Burke and R. Bowhay, *Income Taxation of Natural Resources*, at ¶ 2.10 states:

> *Acquisition by Investment.* An investment in minerals in place may be acquired by purchase for cash, in exchange for other property, for services rendered, by gift, by inheritance, or as a liquidating dividend. An investment in minerals in place may be retained if it is represented by a portion of a previously owned economic interest. It is not necessary that the taxpayer incur a cost in the acquisition or retention of the investment, or that he have any tax basis in such investment. In fact, it is sufficient to show only that a clear capital interest exists, that the interest diminishes as the mineral is extracted, and that the taxpayer shares directly in the economic productivity of the minerals and market risk on their sale. [Footnotes and citations omitted.]

■ Applying these criteria to the facts of this case, it is concluded that Stewart had neither a capital investment nor an economic interest in the mineral in place. Although the State of Missouri owned the sand and gravel in the bed of the Missouri River, it treated it as a natural resource in the public domain available to anyone for the taking, without cost and without exclusive rights. Nor was the federal government the source of an economic interest in Stewart, as the government had no ownership of the minerals and thus could convey no interest in them to plaintiff. Plaintiff's permit from the Corps of Engineers had to do with the manner of dredging rather than with the right to recover the minerals, and such permits were routinely available to anyone who observed the restrictions.

Plaintiff argues that it needed no direct investment or economic interest in the mineral in place to be entitled to the depletion allowance but that, if it did, its investment in its plant and equipment at the unloading site was sufficient for that purpose. However, no case cited by plaintiff supports either thesis.

Plaintiff relies primarily on three cases: *Commissioner v. Southwest Expl. Co.*, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956); *Oil City Sand & Gravel Co. v. Commissioner*, 32 T.C. 31 (1959); and *Victory Sand & Concrete Inc. v. Commissioner*, 61 T.C. 407 (1974), *acq.* 1974–2 C.B.4. These will be discussed seriatim.

1. In *Southwest Exploration Co.*, the State of California had solicited bids for the lease of certain state-owned offshore oil deposits. A condition of the solicitation was that the extraction be done by wells slant-drilled from onshore sites to the submerged oil deposits. To qualify for the bidding Southwest entered into three agreements with upland landowners allowing it to drill from their lands in exchange for payments of 24½ percent of Southwest's net profits from the extraction and sale of the oil. After Southwest had been awarded the leases and oil successfully produced, it claimed percentage depletion measured by the entire gross income from the production unreduced by the 24½ percent share paid to the landowners, on the theory that it had the sole economic interest subject to depletion as the oil was extracted, while the landowners claimed depletion on the theory that to the extent of their shares of the profits, they had economic interests which were being depleted by the exhaustion of the oil and had to be recouped out of their receipts. The Supreme Court held in favor of the landowners.

The underlying question before the Court was whether the upland owners had exhaustible interests in the minerals recov-

erable exclusively from their sale or merely profitable contracts with the owner of the deposit. The Court noted the unique nature of the case in that the fee owners of land *adjoining* the mineral bearing land was claiming a depletion allowance, whereas "in each of the prior cases where the taxpayer has had a sufficient economic interest to entitle him to depletion, he has once had at least a fee or leasehold in the oil-producing properties themselves." (*Ibid* at 314–15, 76 S.Ct. at 398–99.) It found that the upland owners had the necessary economic interests because the contributions of drill sites were not merely useful to the recovery of the oil, but were *essential* to any drilling operations under state law. Their controlling position clearly enhanced the value of their lands when extraction of the oil from the State's offshore fields became a possibility. Therefore, when they chose to release the value of their lands, not by selling their interests for a stated sum, but by contributing their use in return for rentals based on shares of net profits, their contributions were investments in the oil in place sufficient to establish their economic interests. Because their income was dependent entirely on production and because the value of their interest decreased with each barrel of oil produced, they came within the scope of the earlier cases entitling them to a depletion allowance.

The Court stated that it was not deciding any general rule allowing depletion to a land owner disassociated from a mineral lease who contributed an essential facility to a drilling operation in return for a share of the net profits, but rather circumscribed its decision by stating (*Ibid.* at 317, 76 S.Ct. at 400):

> We decide only that where, in the circumstances of this case, a party essential to the drilling for and extraction of oil has made an indispensable contribution of the use of real property adjacent to the oil deposits in return for a share in the net profits from the production of oil, that party has an economic interest

which entitles him to depletion on the income thus received.

Plaintiff asserts that *Southwest* holds broadly that ownership of riparian lands necessary to the successful removal of mineral deposits is a sufficient stake to constitute ownership of a share of the mineral in place. Therefore, plaintiff urges, Stewart's use of the riparian land, on which it constructed and placed substantial improvements necessary to unload, process and store the dredged minerals, was also a sufficient investment in the mineral deposit to entitle it to depletion.

But even if *Southwest* could be so broadly applied, it would not help plaintiff's argument with respect to the facts in this case.

First, Stewart did not *own* any riparian land but merely paid rent to the city, which did own it, for the right to use the land. Furthermore, there is no evidence in the record that the value of the leasehold was in excess of the amount that plaintiff had agreed to pay as rent.

Second, I.R.C. § 162(a) allows a specific deduction for rent paid for the use of property in the trade or business, and presumably plaintiff did take deductions therefor.[6] To allow plaintiff a further deduction for depletion of an investment which it did not make, for land which it did not own, would not be compatible with any rational purpose for the depletion allowance. Moreover, it would be inconsistent with a fundamental principle of the income tax laws that they do not allow double deductions for the same expense. *See United States v. Skelly Oil Co.*, 394 U.S. 678, 684, 89 S.Ct. 1379, 1383, 22 L.Ed.2d 642 (1969), *Charles Ilfeld Co. v. Hernandez*, 292 U.S. 62, 54 S.Ct. 596, 78 L.Ed. 1127 (1934).

Third, although the lease of the land from the city provided that it was to be used for "unloading, preparing, storing, handling, manufacturing and reloading facilities" and therefore was obviously useful, nothing in the record indicates that the particular tract was *essential* to recovery

---

6. The record contains no allegations nor evidence to the contrary.

of the sand and gravel, as was the case in *Southwest Exploration* with respect to the oil.

Fourth, to the extent plaintiff claims that Stewart's investment in the unloading, processing and storage facilities on the leased land was an appropriate basis for finding that it had an economic interest in the deposits of sand and gravel, nothing in *Southwest Exploration Co.* provides authority for such a finding. That case was concerned solely with a contribution by its owners of *land* essential to the extraction of the wasting asset, the enhanced value of which could not be recovered except by way of the depletion allowance. Investments in loading, processing and storage facilities are deductible from income through depreciation deductions and do not require depletion allowances for their recovery.

The distinction between costs recoverable by depletion and depreciation is explicit in I.R.C. § 611(a), the very source of the depletion deduction. It provides that in the case of mines and other natural deposits a taxpayer shall be entitled both to "a reasonable allowance for depletion and for depreciation of improvements." Had Congress intended that depreciable improvements used in the recovery of mineral deposits be the basis for a depletion allowance, it would hardly have allowed a depreciation allowance as well for the same expenditure. And *see also Parsons v. Smith*, 359 U.S. 215, 225, 79 S.Ct. 656, 663, 3 L.Ed.2d 747 (1959).

Moreover, the record does not establish to what extent the facilities could not have been removed and sold, or used elsewhere by Stewart. For example, cranes, tractors, barges, and towboats obviously could have been removed.

2. In *Oil City Sand & Gravel Co. v. Commissioner*, 32 T.C. 31 (1959), the taxpayer was engaged in the business of dredging sand and gravel from the bed of the Allegheny River at two locations near Oil City and Franklin, Pennsylvania, 3 to 4 miles apart. At each location it owned land having frontage on the river and a process-

ing and treatment plant. It had acquired the first tract in 1929, 23 years earlier than the years at issue (1952 and 1953) at a cost of $19,000. It had acquired the second tract in 1947, 5 years earlier, at a cost of $11,000. It sought percentage depletion on the sand and gravel which it dredged within an area approximately 1½ miles upstream and downstream from both locations.

The court found that except for the two riparian properties owned by the petitioner, there was no site on either bank of the Allegheny River near the petitioner's potential dredging operations which was by nature physically adapted for the operation; that it would not be economically feasible for a competing dredger to attempt to adapt other riparian properties for such use; that no other person could remove the sand and gravel in the river bed in the area between Oil City and Franklin, Pennsylvania, by the usual economic methods without using the petitioner's lands; and that the petitioner's ownership of the parcels of riparian land at Oil City and Franklin gave it exclusive physical and economic control over the dredging of sand and gravel located in the river bed within an area of approximately 1½ miles upstream and 1½ miles downstream from each parcel of land. Under these circumstances, the court held, even though under Pennsylvania law title to the beds of the navigable rivers was in the state and the right to remove the sand and gravel was a public right belonging to the people of the state generally, the real estate the petitioner employed in its dredging of the sand and gravel deposits was indispensable to the removal of such deposits and, accordingly, under the theory of the *Southwest Exploration* case the taxpayer had an economic interest in the sand and gravel which entitled it to depletion on the income from the removal and sale.

*Oil City Sand & Gravel Co.* is likewise distinguishable from the instant case for some of the same reasons which were applicable to *Southwest Exploration Co.*

First, although the taxpayer in *Oil City Sand & Gravel Co.* had also made investments in machinery and equipment, the court's reasoning is based on its ownership of the riparian real estate from which it operated, not the equipment. It had made substantial capital investments in such tracts years earlier and they may have well have been worth considerably more during the taxable years at issue. The depreciation allowance was not available for the recovery of its land costs or value. Therefore, the proceeds from the recovery and sale of the sand and gravel were necessary to enable that company to recover its capital investment in the land and/or its economic value. As already noted, Stewart made no investment in the land it rented and, therefore, it did not require an allowance from the recovery and sale of the mineral deposit to recoup an economic interest.

Second, the riparian real estate which the Oil City Sand & Gravel Co. used in its business was indispensable to the recovery of the sand and gravel and thereby gave the company "exclusive physical and economic control over the deposits" (*Ibid.* 32 T.C. at 38), whereas there is no evidence here that the land Stewart employed gave it exclusive physical and economic control over the deposits it recovered, or that it could not have operated from other bases. Indeed, the fact that there were several other companies operating in the vicinity with overlapping Corps of Engineers permits indicates otherwise.

3. In *Victory Sand & Concrete Inc. v. Commissioner,* 61 T.C. 407 (1974) *acq.* 1974–2 C.B.4, the taxpayer was engaged in the business of extracting sand and gravel from the Kansas River, pursuant to a contract and permit from the State of Kansas, which had title to the riverbed, including any natural resources therein, and in return for which the petitioner agreed to pay a royalty to the State of 2¢ for every ton of sand taken from the river. As in *Oil City Sand & Gravel Co.,* the taxpayer had also made an investment in and owned land adjacent to the river, which it used for extraction of the sand, and there were no other sites suitable for profitable dredging operations within a reasonable distance of Topeka, Kansas, where it sold the sand. Although the court stated that its conclusion was not entirely free from doubt (*ibid.* at 413), it held that the case was so similar to the *Oil City Sand & Gravel Co.,* that the latter provided authority for it to conclude that "petitioner had an economic interest in the sand and gravel deposits which it extracted by virtue alone of its *ownership* of the tract of land adjacent to the riverbed deposits *which * * * was the only land available from which these deposits could be extracted and which petitioner contributed to the extraction and production process.*" [Emphasis added.] (*Ibid.* at 416.) In addition, the court found further basis for its conclusion that the taxpayer had an economic interest in the deposits in the facts that the taxpayer had exclusive rights from the state to extract the particular deposit; that the taxpayer paid a royalty to the state for such rights; that the contract with the state bore no termination date; and that under state law, the contract was not terminable without cause. None of these facts are present in the instant case.

For some of the same reasons already discussed with respect to *Southwest Exploration Co.* and *Oil City Sand & Gravel Co.,* plus the facts that the *Victory Sand & Concrete Co.* paid royalties for the minerals it extracted and had exclusive rights therein prior to extraction, it is apparent that the *Victory* decision likewise provides no support for plaintiff's position herein.

Plaintiff also claims that its investment in plant and equipment is analogous to the investment made by the taxpayer in *Food Machinery Corp. v. United States,* 177 Ct.Cl. 219, 366 F.2d 1007 (1966), and that in that case the Court of Claims found that the plaintiff's investment in depreciable equipment constituted the requisite investment for an economic interest in certain Idaho phosphate deposits. However, this argument ignores the court's findings that the taxpayer in *Food Machinery* had a legally enforceable right to obtain all the

phosphate it required from the production of the mine, reserving the right to substitute another mining company if the original party was unable to meet its requirements. (172 Ct.Cl. 317–18, 348 F.2d 923–24.) That plaintiff made a $20,000,000 investment in four huge immovable electric furnaces at a site completely isolated from all sources of raw input except one was a fact which persuaded the court that the Food Machinery Corp. had an ironclad guarantee of the right to obtain the phosphate and, therefore, had an economic interest in the mineral deposit. (172 Ct.Cl. at 326, 348 F.2d at 928–29.)

Plaintiff further contends that in *National Steel Corp. v. United States,* 176 Ct.Cl. 952, 364 F.2d 375 (1966), *Thornberry Constr. Co. v. United States,* 217 Ct.Cl. 196, 576 F.2d 346 (1978), and *United States v. Swank,* 451 U.S. 571, 576, 101 S.Ct. 1931, 1935, 68 L.Ed.2d 454 (1981), the Court of Claims and the Supreme Court, in applying *Southwest Exploration Co.,* allowed percentage depletion even in the absence of a direct monetary investment or payment for the minerals or natural deposits. However, as already discussed, such fact is not determinative—as it is sufficient for a percentage depletion allowance that the taxpayer has an economic interest in the mineral in place, no matter how acquired.

In *National Steel Corp.,* the question was whether the taxpayer or its subsidiary had made the investment in the coal deposits used by the plaintiff in its steel manufacturing operations. The court found that the subsidiary was only a "cost company" and that "the plaintiff, as a matter of actual fact, had a capital investment in the Isabella Mine during [the years at issue]." (176 Ct.Cl. at 967, 364 F.2d at 383.) In *Thornberry Constr. Co.,* 217 Ct.Cl. at 208, 576 F.2d at 353, the taxpayer had a direct economic interest in 800,000 tons of coal, which it had the right to mine, and the court expressly found that "it is crystal clear that plaintiff acquired by investment an interest in the coal in place." In *Swank* each taxpayer-lessee had the right to mine the coal either to exhaustion or for fixed periods of years unless the lessor sooner

terminated on 30 days' notice, and each was to pay to his lessor a fixed royalty for each ton extracted.

Plaintiff further argues that *Stewart* should be entitled to an allowance for depletion since, otherwise, no other party could claim the deduction. That factor may be significant on the question of which of the two parties, a lessor or a lessee, should obtain the depletion allowance which can only be available to one. *See Swank v. United States,* 451 U.S. at 577, 101 S.Ct. at 1935 and *Bakerstown Coal Co. v. United States,* 202 Ct.Cl. 842, 857, 485 F.2d 633, 642 (1973). It is not relevant in this case, because the State of Missouri, which owned the mineral in place, was not a competing claimant for the allowance. Under the circumstances, the fact that Missouri does not claim or secure a depletion deduction is not a valid reason why plaintiff, which is not entitled to it, should obtain the allowance.

Finally, plaintiff argues that as lessee from the municipality of Kansas City, it was entitled to all of the sand and gravel between the low and high watermarks to which Kansas City was entitled by virtue of its ownership of the riparian land. This argument is not persuasive for several reasons: First, the record does not indicate the extent, if any, to which sand or gravel was in fact obtained from the leased land. Second, nothing in the lease provided that plaintiff or Stewart was entitled to extract the sand or gravel from it. As noted previously, the lease provided that the premises were to be used "for the purpose of unloading, preparing, storing, handling, and reloading sand and other building materials." Nothing was said about allowing the lessee to dredge or otherwise remove the sand or gravel from the leased premises. Indeed, the inference was that it was not permitted to do so, since at the termination of the lease the lessee was obligated "to restore the leased premises to as good condition as at the beginning of its occupancy."

The facts of this case make clear that Stewart, having failed to make an invest-

ment or to acquire an economic interest in the Missouri River sand and gravel deposits, either directly or indirectly, held only an economic advantage derived from its dredging operations. Accordingly, it failed to qualify for the depletion allowance with respect thereto.

## II. *Deductibility of Payment in Settlement of Class Action.*

### *Facts*

On October 18, 1962, plaintiff, then known as Mississippi River Fuel Corporation ("Mississippi"), made a public offer to acquire up to 900,000 Missouri Pacific Railroad Company ("MoPac Railroad") Class A shares in exchange for shares of its own common stock at the rate of 1⅓ Mississippi shares for each MoPac Railroad Class A share. The exchange offer was contained in a prospectus and letter of Mississippi which were mailed to all MoPac Railroad shareholders. The prospectus was also part of a registration statement filed with the Securities and Exchange Commission.

Pursuant to the exchange offer, an aggregate of 321,795 MoPac Railroad Class A shares were exchanged for an aggregate of 429,060 Mississippi common shares.

In March 1964 class actions were filed against plaintiff, its directors, and by subsequent amendment, against MoPac Railroad and its directors, in the United States District Court for the Eastern District of Missouri in cases styled *Eugene Bauer v. Clark* and *Robert B. Shea v. Mississippi River Fuel Corporation,* (hereinafter Shea-Bauer litigation or complaints). In these complaints the class action plaintiffs invoked the Securities Act of 1933, the Securities Exchange Act of 1934, and the common law. Each complaint [7] in substantially identical language charged that the Mississippi letter and prospectus, as well as the MoPac Railroad letter, to the MoPac Railroad Class A shareholders, contained representations which were materially false, misleading and incomplete, and

which made it appear that the MoPac Railroad Class A shares were worth less and that the Mississippi common shares were worth more than their true values in the exchange. The principal allegations underlying the charges were:

1. The prospectus accompanying Mississippi's letter to the MoPac Railroad stockholders set forth that MoPac Railroad's net income after accrued taxes for the first 6 months of 1962 had been $7,105,000, equal to $3.85 per share, whereas the Railroad's actual net income for such period was $12,027,000, equal to $6.52 per share. Thus, the actual income for the 6 months immediately preceding the letter to the stockholders was more than 69 percent in excess of the amount stated in the prospectus. Such understatement was due to failure to reflect in the prospectus an approximate $4,922,000 reduction in MoPac Railroad's accrued income taxes due to accelerated amortization and depreciation to which it was entitled under the Revenue Act of 1962, enacted shortly before the letter to MoPac Railroad's shareholders. MoPac Railroad's actual net income after taxes for the entire year 1962 was $22,250,000, equal to about $12.07 per Class A share, about 75 percent in excess of what its net income would have been without the accelerated amortization and depreciation deductions. Had this been properly reflected in the prospectus, it would have shown that the earnings attributable to MoPac Railroad's Class A shares were considerably higher than stated and hence the value of each such share was in excess of the value of the Mississippi shares allocated to it in the exchange.

2. The prospectus misrepresented the value of each share of MoPac Railroad's Class A stock by understating the dividends which could be expected to be paid thereon. The prospectus showed that from 1957 to the third quarter of 1962 MoPac Railroad had paid dividends on its Class A shares at the annual rate of $2.40 per

---

**7.** The allegations are taken from the 4th amended Shea complaint, filed June 30, 1967, and the amended consolidated Bauer complaint filed

July 6, 1967. These were the last amendments prior to settlement.

share, and that this would continue to be paid on the 1⅓ shares of Mississippi stock to be received in exchange therefor. It also showed that the earnings of the company for the first 6 months of 1962, if annualized, would have yielded a sum available for dividends of only $3.60 for each Class A share, not enough to declare and pay the full $5 dividend payable thereon, whereas, a more truthful financial report of earnings for the first half of 1962 would have reflected probable annualized available income of $8.74 for each Class A share, more than ample to declare and pay the full $5 dividend thereon. It recited the following as facts in substantiation of the foregoing: The outstanding Class A shares received dividends of $4 per share in 1963 and $5 per share in 1964, 1965 and 1966; the actual available income for the entire year 1962 was $7.77 for each Class A share; in January 1963, upon the announcement of MoPac Railroad's increased income in 1962 resulting from its reduction in current income taxes, MoPac Railroad's Class A stock, which on October 15, 1962, sold on the New York Stock Exchange at $44.25 per share, sold within 2 weeks thereafter at above $60 per share; and, following the announcement by MoPac Railroad's president of the likelihood of increased dividends, it sold in May 1963 at above $73 per share and subsequently as high as $96.50 per share.

3. The prospectus misrepresented MoPac Railroad's retained income available for the payment of dividends as of December 31, 1961 and June 30, 1962, as amounting to $130,538,836 and $136,588,264, respectively, when in fact the figures were understated by at least $51,916,000.

4. The prospectus made misleading statements calculated to convey the impression that MoPac Railroad's directors and executive officers, who were fully informed, considered the exchange offer to be favorable to the MoPac Railroad's Class A stockholders, but failed to reveal that six of MoPac Railroad's directors, owning more than 26,000 MoPac Railroad's Class A shares, did not intend to accept the exchange offer.

5. The prospectus misled the MoPac Railroad's Class A stockholders when it recommended to them as advantageous to their interests acceptance of Mississippi's exchange offer but at the same time failed to reveal or concealed from them that Mississippi controlled MoPac Railroad.

6. The prospectus misleadingly represented that Mississippi River's total oil exploration expenses for the year 1962 would not substantially exceed $2,000,000 whereas in fact they were about $3,690,000, thereby overstating Mississippi's prospective earnings for 1962 by about 22¢ per share, or about 10 percent. The prospectus also failed to reveal that Mississippi's natural gas business, which produced ⅔ of its total revenue, had exhausted its potential and had no growth prospects. Thus, by implication, it also overstated the value of the Mississippi shares in the exchange.

The complaints asserted that on November 21, 1962, the day on which the exchanges under Mississippi's offer became effective, the market price of MoPac Railroad's Class A stock on the New York Stock Exchange was $44.75 per share but its fair value was at least $73 per share. They also claimed that on the same day the market price of the Mississippi stock on the New York Stock Exchange was $33.75 per share, or only $45 for 1⅓ Mississippi shares. They asserted that the plaintiffs in the class action did not and could not by the exercise of reasonable diligence discover the untrue statements and omissions alleged as of the time of the exchange. Accordingly, they demanded damages in an amount equal to at least $28 for each MoPac Railroad's Class A share deposited under Mississippi's exchange offer because they had been damaged in that amount and Mississippi had been unjustly enriched to at least the same extent. The plaintiffs further tendered the Mississippi shares held by them against the return or transfer to them of the MoPac Railroad's Class A shares.

After extensive discovery, motions to dismiss as to some or all the defendants

and counts, and other pretrial proceedings, including the depositions of a number of witnesses, a stipulation of settlement dated November 8, 1967, was agreed to by all the parties to the Shea-Bauer proceeding. The terms of the settlement agreed were as follows:

If the federal district court approved the proposed settlement as fair, reasonable and adequate, and if the judgment of approval became final, then Mississippi River would be obligated to pay the sum of $1,250,000, less $3.88 per share for each MoPac Railroad's Class A share exchanged by the class members who elected to be excluded from the class action settlement.

Pursuant to the settlement agreement, and subsequent court approval thereof, plaintiff on April 8, 1968, paid $1,239,-407.60, or $3.88 per share, to a bank for distribution to assenting affected shareholders, less legal fees and expenses of counsel for the class action plaintiffs. Plaintiff also paid a fee of $1,500 to special counsel to its board of directors in consideration of such counsel's review of the proposed settlement.

### Discussion

■ Plaintiff contends that the $1,239,-407 payment by Mississippi to the Class A stockholders of MoPac Railroad and the $1,500 it paid its special counsel were deductible under I.R.C. § 162(a) as ordinary and necessary business expenses, while defendant maintains that they were capital expenditures, deduction of which are barred by I.R.C. § 263. Defendant's argument is that the expenditures were capital because they were incurred in connection with the acquisition of capital assets by Mississippi.

This issue appears to be governed by the decision in *Arrowsmith v. Commissioner*, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952). There two taxpayers liquidated a corporation in which each owned 50 percent of the stock. They distributed the proceeds to themselves over the 4-year period 1937–40

and reported the profits thereon as capital gains. In 1944, a judgment was rendered in favor of a third-party against the corporation, and, as a transferee of the corporate assets, each of the taxpayers was required to pay half the judgment. Each then deducted the amount paid as an ordinary loss incurred in 1944. But the Commissioner disallowed the deduction as an ordinary loss, because he viewed the 1944 payment as part of the original liquidation transaction, requiring classification as a capital loss, just as the taxpayers had treated the original distributions as giving rise to capital gains.

The Supreme Court upheld the Commissioner. It ruled that the 1937–40 liquidation transaction events had to be considered in order properly to classify the nature of the 1944 losses for tax purposes. As the distributions the taxpayers received in liquidation of the corporation were in exchange for their stock (1939 I.R.C. § 115(c) [8]), the losses the taxpayers sustained thereafter as transferees of the corporate assets required to pay its debts were "losses from * * * exchanges of capital assets" within the terms of 1939 I.R.C. § 23(g) [9] and hence capital losses. Had the liabilities been paid after liquidation during 1940, there would have been no question that they would have been properly treated as capital ones, for "payment during 1940 would simply have reduced the amount of capital gains taxpayers received during that year." (*Arrowsmith*, 344 U.S. at 8, 73 S.Ct. at 73.) The fact that the payments were made during a later year did not change their nature.

The $1,239,407 payment by Mississippi to the class action stockholders represented a reimbursement of $3.88 per share for each MoPac Class A shares they exchanged for 1⅓ Mississippi shares in compromise of their claim for $28 per share asserted on the theory that their MoPac Railroad shares had not been fairly valued. To the extent of the $3.88, per share therefore, it

---

**8.** Now 1954 I.R.C. § 331(a)(1).

**9.** Now 1954 I.R.C. § 165(f).

was an adjustment of the amount paid in to Mississippi for its stock. As the original exchange was a capital event giving rise to no taxable income to Mississippi [10], the adjustment thereof should likewise give rise to no deduction from income but only to an adjustment to the basis of its assets paid in for its stock.

Neither party cited *Arrowsmith* in its brief, but both relied on the application of the rule of three other Supreme Court decisions to the facts of this case: *United States v. Gilmore*, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963); *Woodward v. Commissioner*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970); and *United States v. Hilton Hotels Corp.*, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970). None of these decisions deals directly with the tax treatment of payments in settlement of claims, as does *Arrowsmith*, but rather with the tax treatment of attorneys' fees and other litigation expenses where the motives of the parties for the prosecution or defense of the litigation are mixed; and hence the decisions are not directly in point. However, to the extent they are applicable, they serve to confirm the nexus between the settlement payment and the original exchange of stock, and between the Shea-Bauer class actions and the $1,500 legal fee paid by plaintiff to its special counsel.

In *Gilmore* the Supreme Court held that the entire legal expense of defending a divorce suit was a nondeductible personal expense, even though the outcome of the divorce case could have adversely affected the taxpayer's property holdings and his business reputation and caused him to lose a profitable automobile dealership franchise. The court rejected tests that looked to the potential consequences of an adverse judgment in the litigation and the taxpayer's motives or primary purposes in undertaking defense of the litigation, but rather examined the origin and character of the claim against the taxpayer and found that the claim arose out of the personal relationship of marriage.

In *Woodward* the court applied the same test to determine whether particular litigation expenses were deductible as "ordinary * * * for the management, conservation, or maintenance of property held for the production of income" (I.R.C. § 212) or nondeductible capital expenditures. The expenses were incurred for attorneys', accountants' and appraisers' fees in a legal proceeding to ascertain the buy out value required by law to be paid by controlling stockholders to a minority stockholder who voted against the renewal of a corporate charter. As in *Gilmore*, the court held that in such litigation the "primary purpose" of the taxpayer in undertaking or defending the particular litigation is too uncertain and difficult a test to apply in order to determine whether the litigation expense constitutes an ordinary expense or a cost of acquisition of a capital asset and that the proper "simpler inquiry [is] whether the origin of the claim litigated is in the process of acquisition itself." (*Woodward*, 397 U.S. at 577, 90 S.Ct. at 1306.) Second, the court held since expenditures incurred in negotiating a purchase price for the stock would have been capital, expenditures in appraisal proceedings to fix the purchase price should be similarly treated, even if title to the minority stock was not put in question by the proceeding.

The companion case of *Hilton Hotels* posed a similar issue, except that the dissenting stockholders entitled to be bought out at appraisal value by the majority were those who opposed a merger and that the merger had already taken place and the consolidating company had acquired all of the stock at the time the dissenters began the appraisal proceedings in the state court. Looking again to the nature of the proceeding, the court stated "As we held in *Woodward, supra*, the expenses of litigation that arise out of the acquisition of a

---

10. I.R.C. § 1032. Exchange of stock for property

  (a) Nonrecognition of gain or loss.—No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation.

capital asset are capital expenses, quite apart from whether the taxpayer's purpose in incurring them is the defense or perfection of title to property." (*Hilton Hotels,* 397 U.S. at 583, 90 S.Ct. at 1309.) With respect to the claimed distinction between the two cases that in *Woodward* passage of title to the stock had been delayed until after the price was settled and in *Hilton* title had passed and the dissenters were mere creditors, the court observed that it was a distinction without a difference. "Determination and payment of a price is no less an element of an acquisition by purchase than is the passage of title to the property." (*Ibid.,* at 584, 90 S.Ct. at 1309.)

Neither in *Woodward* nor *Hilton Hotels* was the treatment of the amount paid to the minority stockholders as a capital expenditure at issue. Indeed, the court expressly noted that "Hilton concedes that the payment for the stock was a capital expenditure on its part." (*Hilton Hotels,* 397 U.S. at 585, 90 S.Ct. at 1309.)

The problem with which the Supreme Court dealt in the *Gilmore—Woodward—Hilton Hotels* line of cases is broader and more complex than that involved here. When a party to litigation has incurred attorneys' fees or other litigation expenses in a suit involving mixed motivation or issues, it may be difficult to allocate them because they may have been attributable not only to the amount of the judgment but also to the efforts of the attorney directed to defense or prosecution of the other issues on which the court did not award judgment to the plaintiff. Therefore, it becomes necessary to determine the predominant nature of the claim or proceedings in connection with which the legal expenses were incurred before the nature of the legal expenses may be determined. But if the nature of the judgment itself or a settlement incorporated in a judgment approved by a court is self-evident or separable from the disposition of other issues,

there is no reason to determine the nature of the entire proceedings.[11]

Since here the nature of both the complaint and the court approved settlement coincide, it is immaterial whether the tests applied by *Arrowsmith* or by the *Gilmore—Woodward—Hilton Hotels* line of decisions is applied. Under either test, the price adjustment made by the taxpayer here for the stock it acquired from the MoPac Railroad stockholders must be deemed a capital expenditure rather than an ordinary business expense.

Plaintiff denies that the nature of the stockholders' suit here at issue was for an adjustment of the purchase price of their MoPac Railroad stock and alleges that its $1,239,407 payment was in settlement of a claim unrelated to the exchange of stock. It asserts instead that—

> In the instant case, the taxpayer was sued for breach of fiduciary duty in its role as controlling shareholder of Missouri Pacific, and also was sued for securities fraud for its purported manipulation of Mopac stock prices and the issuance of a fraudulent prospectus and other documents.

that—

> The actual exchange of stock by the *Shea-Bauer* plaintiffs, albeit a capital event, merely furnished the leverage necessary to extract a settlement from the taxpayer.

and that—

> the instant complaints were the product of an ongoing dispute between management and certain shareholder groups which has given rise to "strike suits" against the Company during most of its recent history. The instant group of Mopac Class A shareholders represented by Shea and Bauer sued taxpayer, as controlling shareholder of Mopac, for alleged violations of its fiduciary duties owed to them as minority shareholders. * * * Among the purported transgressions against Class A shareholders, tax-

---

**11.** For example, if a judgment is in connection with a single count of a ten count complaint dealing with unrelated issues, the predominant nature of the other counts may be wholly irrelevant to the nature of the payment in satisfaction of the judgment on the first count.

payer was accused of improperly withholding Class A dividends, issuing fraudulent and incomplete financial statements and other documents, and depressing artificially the market price for Mopac Class A stock, in breach of its fiduciary obligation and in violation of federal securities laws to the injury of Class A shareholders.

However, plaintiff's position must be rejected for at least four reasons.

First, it is not supported by the nature of the complaints, which have been outlined at some length herein to show that their allegations were serious and substantial. It is true that the fifth count of the Shea complaint alleged that Mississippi, commencing on or before January 1, 1961, engaged in a campaign of acquiring shares of MoPac Railroad's Class A stock on the New York Stock Exchange, and, in order to obtain the shares at low prices, through its control of MoPac Railroad and acting together with the other defendants, had caused MoPac Railroad unofficially and arbitrarily to withhold any increase in the MoPac Railroad's Class A stock dividend rate and had also caused MoPac Railroad to understate its earnings, until Mississippi had completed its purchase of a controlling interest in MoPac Railroad's Class A stock. However, by order entered September 25, 1967, the district court dismissed such portion of the fifth count as inappropriate to state a basis for a class action on behalf of the stockholders generally, and allowed it to remain only insofar as it alleged a claim on behalf of Shea individually with respect to 400 shares that he had sold on the stock exchange in March 1962. Thus, such allegations could hardly have been a substantial basis for the subsequent settlement of the class action.

Second, it is not compatible with the order of the district court approving the settlement of the class action which gave rise to the payment. That order, entered February 9, 1968, described the nature of the claim which was being settled by the payment as follows:

The actions result from a public offer made on October 18, 1962, by Mississippi River Corporation to acquire up to 900,-000 Class A shares of Missouri Pacific Railroad in exchange for shares of its own common stock at the rate of one and one-third Mississippi River shares for each Missouri Pacific Class A share. The exchange offer was contained in a prospectus and a letter of Mississippi River which were mailed to Missouri Pacific shareholders. The prospectus was also part of a registration statement filed with the Securities and Exchange Commission. Pursuant to the exchange offer, an aggregate of 321,795 Missouri Pacific Class A shares were exchanged by some 1200 shareholders for an aggregate of 429,060 Mississippi River shares.

In substance, each complaint alleges, in substantially identical language, that the prospectus and letter of Mississippi River as well as a letter which Missouri Pacific, through its directors, sent to its Class A stockholders, contained misrepresentations which were materially false, misleading and incomplete, and that by reason thereof each member of the class (those who made the exchange) suffered damages equal to at least $28 for each Missouri Pacific Class A share exchanged, and Mississippi River derived benefits of at least $50 for each said share exchanged. Alternative claims for damage and recision were set forth.

Third, the $1,239,407 payment at issue was paid only to the holders of the 321,795 MoPac Railroad Class A shares who had exchanged their shares for the Mississippi shares and not to the Class A shareholders generally.[12]

---

12. The stipulated record does not reflect the total of outstanding shares. However, the district court order approving the settlement stated that Mississippi's offer had been to acquire up to 900,000 Class A shares of MoPac Railroad, but that only 321,795 shares were actually exchanged. The order recited that the stipulation for settlement provided that Mississippi was to pay $1,250,000 to the plaintiffs, reduced by $3.88 for each MoPac Class A share exchanged by any member of the class who requested exclusion from the settlement. The 321,795

312

Fourth, plaintiff has failed to carry its burden of proof that the $1,239,407 payment was in settlement of claims other than as stated in the district court order approving the settlement. The fact that the record was wholly stipulated does not change the result. Where a plaintiff has sought to establish facts by stipulation and the stipulation is inadequate for that purpose, the net effect is that the plaintiff has failed to carry his burden of proof. *Boehm v. Commissioner,* 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1945); *Maryland Savings-Share Ins. Corp. v. United States,* 226 Ct.Cl. 487, 505 n. 15, 644 F.2d 16, 27 (1981).

Accordingly, neither the payment made by plaintiff to its stockholders in settlement of their class action nor the payment to its special counsel in connection with the litigation is deductible as an ordinary and necessary business expense.

*Conclusion*

In light of the foregoing, it is concluded that plaintiff's complaint is not supported by the facts and applicable law, and accordingly judgment will be entered for defendant, dismissing the complaint.

shares times $3.88 equals $1,248,564. Although the amount actually paid out was $9,157 less, the difference is not explained. Presumably the owners of 2,360 shares requested exclusion from the settlement.